# 14-4714-CR(L)

## 14-4715-cr(CON), 14-4716-cr(CON), 14-4719-cr(CON), 15-50-cr(CON), 15-64-cr(XAP), 15-66-cr(XAP), 15-68-cr(XAP), 15-71-cr(XAP), 15-72-cr(XAP)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

*v.*

JEROME O'HARA, GEORGE PEREZ, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI,

*Defendants-Appellants-Cross-Appellees,*

*and*

ERIC S. LIPKIN, DAVID L. KUGEL, ENRICA COTELLESSA-PITZ, CRAIG KUGEL, PETER MADOFF, IRWIN LIPKIN, PAUL J. KONIGSBERG,

*Defendants.*

———————————

*On Appeal from the United States District Court for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLANT-CROSS-APPELLEE DANIEL BONVENTRE (REDACTED)

THE LAW OFFICES OF ANDREW J. FRISCH
*Attorneys for Defendant-Appellant-*
*Cross-Appellee Daniel Bonventre*
40 Fulton Street, 23rd Floor
New York, New York 10038
212-285-8000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

CASE AND JURISDICTIONAL STATEMENT ...................................................1

QUESTIONS PRESENTED AND STANDARDS OF REVIEW ...........................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

   I    STATEMENT OF THE CASE .................................................................12

       A.  Background ...................................................................12

       B.  Bonventre's Role in the Broker-Dealer Business ...........................15

       C.  Bonventre's Limited Contacts with the IA Business Did Not Provide Him with Knowledge of Any Wrongdoing ...................18

       D.  Bank Loans and Tax Audits ................................................23

       E.  Bonventre's Compensation .................................................26

       F.  Bonventre's Inquiries and the Lack of Any Red Flags .......................30

       G.  Bonventre's Innocence as the Firm Collapses ..................................36

       H.  The Government's Case and the Proceedings Below .........................38

POINT I

THE COURT'S INSTRUCTION ON CONSCIOUS
AVOIDANCE WAS PREJUDICIAL ERROR ........................................43

       A.  Legal Principles .................................................................44

       B.  Conscious Avoidance was not meant to apply in this type of case ...............................................................50

C.  The Instruction on Conscious Avoidance
Lacked an Evidentiary Foundation .......................................52

D.  Conscious Avoidance Was Misapplied to the Conspiracy
Charges .........................................................................63

E.  The Charge Was Prejudicial and Not Harmless.................................67

POINT II

THE GOVERNMENT'S REBUTTAL REQUIRES REVERSAL .................69

A.  Rebuttal Misconduct: What Was Said .......................................70

B.  Misconduct and Prejudice .........................................................84

POINT III

CHARGES BASED ON BONVENTRE'S EVASION OF
PERSONAL INCOME TAX SHOULD HAVE BEEN
SEVERE ........................................................................98

POINT IV

BONVENTRE WAS DENIED DUE PROCESS BY THE
GOVERNMENT'S FAILURE TO PROVIDE ADEQUATE
PARTICULARS.......................................................................105

CONCLUSION ...........................................................................111

CERTIFICATION OF COMPLIANCE ............................................112

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Berger v. United States*,
  295 U.S. 78 (1935) ...........................................................................91

*Blissett v. Lefevre*,
  924 F.2d 434 (2d Cir. 1991)...........................................................86

*Floyd v. Meachum*,
  907 F.2d 347 (2d Cir. 1990)......................................................85, 92

*Friedman v. Rehal*,
  618 F.3d 142 (2d Cir. 2010).............................................................12

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) ...............................................46, 47, 48, 49

*In re Winship*,
  397 U.S. 358 (1970) .........................................................................63

*Koufakis v. Carvel*,
  425 F.2d 892 (2d Cir. 1970).............................................................76

*Lesko v. Lehman*,
  925 F.2d 1527 (3d Cir. 1991)..........................................................92

*Skilling v. United States*;
  561 U.S. 358 (2010) .........................................................................50

*United States v. Abreu*,
  342 F.3d 183 (2d Cir. 2003).............................................................57

*United States v. Aina-Marshall*,
  336 F.3d 167 (2d Cir. 2003).................................................2, 59, 67

*United States v. Alston-Graves*,
    435 F.3d 331 (D.C. Cir. 2006) .......................................................48

*United States v. Alvarado*,
    838 F.3d 311 (9th Cir. 1988).........................................................58

*United States v. Antonelli Fireworks*,
    155 F.2d 631 (2d Cir. 1946)....................................................93, 94

*United States v. Azubike*,
    504 F.3d 30 (1st Cir. 2007) ..........................................................85

*United States v. Banki*,
    685 F.3d 99 (2d Cir. 2011)..............................................................3

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1995).......................................................108

*United States v. Beckett*,
    724 F.2d 854 (9th Cir. 1984)....................................................46, 58

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990).................................................99, 102

*United States v. Biasucci*,
    786 F.2d 504 (2d Cir. 1986).........................................................89

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000).............................................109

*United States v. Blueford*,
    312 F.3d 962 (9th Cir. 2002).......................................................90

*United States v. Bortnovsky*
    820 F.2d 572 (2d Cir. 1987).......................................................107

*United States v. Carter*,
    236 F.3d 777 (6th Cir. 2001).......................................................85

iv

*United States v. Cassese*,
  428 F.3d 92 (2d Cir. 2005)..................................................................56

*United States v. Ceballos*,
  340 F.3d 115 (2d Cir. 2003)..........................................................56, 66

*United States v. Certified Envtl. Servs.*,
  753 F.3d 72 (2d Cir. 2014)........................................85, 88, 93, 95

*United States v. Collins*,
  581 Fed. Appx. 59 (2d Cir. 2014).................................................50

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012)..............................................................56

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013)............................................................50

*United States v. Davidoff*,
  845 F.2d 1151 (2d Cir. 1988)........................................................107

*United States v. Delreal-Ordones*,
  213 F.3d 1263 (10th Cir. 2000).....................................................47

*United States v. Di Tommaso*,
  817 F.2d 201 (2d Cir. 1987)............................................................63

*United States v. Ebbers*,
  458 F.3d 110 (2d Cir. 2006)............................................................50

*United States v. Elias*,
  285 F.3d 183 (2d Cir. 2002)............................................................88

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011)............................................................53

*United States v. Feroz*,
  848 F.2d 359 (2d Cir. 1988)............................................................59

*United States v. Ferrarini*,
    219 F.3d 145 (2d Cir. 2000)..............................................................*passim*

*United States v. Flores-De Jesus*,
    569 F.3d 8 (1st Cir. 2009) ...........................................................107

*United States v. Fofanah*,
    765 F.3d 141 (2d Cir. 2014).............................................2, 56, 67

*United States v. Forloma*,
    94 F.3d 91 (2d Cir. 1996).............................................................85, 88

*United States v. Friedman*,
    300 F.3d 111 (2d Cir. 2002).............................................................65

*United States v. Friedman*,
    909 F.2d 705 (2d Cir. 1990)........................................................85, 91

*United States v. Gansman*,
    657 F.3d 85 (2d Cir. 2011).................................................................61

*United States v. Garcia*,
    413 F.3d 201 (2d Cir. 2005)...........................................................106

*United States v. Gaviria*,
    740 F.2d 174 (2d Cir.1984)..............................................................65

*United States v. Giovanetti*,
    919 F.2d 1223 (7th Cir. 1991)..............................................46, 48, 61

*United States v. Giraldo*,
    80 F.3d 667 (2d Cir. 1996)............................................................108

*United States v. Gleason*,
    616 F.2d 2 (2d Cir. 1979)................................................................85

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)..............................................................56

*United States v. Goffer*,
    721 F.3d 113 (2d Cir. 2013)................................................................47, 50, 57

*United States v. Griffin*,
    524 F.3d 71 (1st Cir. 2008) ...........................................................................54

*United States v. Halper*,
    590 F.2d 422 (2d Cir. 1978).........................................................................100

*United States v. Hassan*,
    542 F.3d 968 (2d Cir. 2008) ..........................................................................65

*United States v. Heredia*,
    483 F.3d 913 (9th Cir. 2007).................................................................*passim*

*United States v. Hilliard*,
    31 F.3d 1509 (10th Cir. 1994)........................................................................44

*United States v. Holmes*,
    413 F.3d 770 (8th Cir. 2005)..........................................................................85

*United States v. Hopkins*,
    53 F.3d 533 (2d Cir. 1995).............................................................................45

*United States v. Jewell*,
    532 F.2d 697 (9th Cir. 1976)................................................................45, 49, 58

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010).....................................................................62, 67

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007)...........................................................................62

*United States v. Kerik*,
    615 F. Supp. 2d 256 (S.D.N.Y. 2009).........................................................100

*United States v. Kozeny*,
    667 F.3d 122 (2d Cir. 2011)....................................................................44, 58

*United States v. Labat*,
905 F.2d 18 (2d Cir. 1990)..............................................................108

*United States v. Lara-Velasquez*,
919 F.2d 946 (5th Cir. 1990)............................................................45

*United States v. Lawrence*,
735 F.3d 385 (6th Cir. 2013)............................................................91

*United States v. Litwok*,
678 F.3d 208 (2d Cir. 2012)..............................................2, 100, 103

*United States v. Lorenzo*,
534 F.3d 153 (2d Cir. 2008)......................................................56, 66

*United States v. Mankani*,
738 F.2d 538 (2d Cir. 1984)..............................................................64

*United States v. Melendez*,
57 F.3d 238 (2d Cir. 1997)....................................................88, 89, 91

*United States v. Miller*,
738 F.3d 361 (D.C. Cir. 2013) ........................................................106

*United States v. Modica*,
663 F.3d 1173 (2d Cir. 1981)............................................................90

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) .........................................................107

*United States v. Morgan*,
385 F.3d 196 (2d Cir. 2004)....................................................*passim*

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991)..............................................................56

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000)..............................................108

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006).................................................................*passim*

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014)...............................................................55, 56, 66

*United States v. Ogando,*
    547 F.3d 102 (2d Cir. 2008)...............................................................55

*United States v. Parker,*
    903 F.2d 91 (2d Cir. 1990)...............................................................80

*United States v. Pica,*
    692 F.3d 79 (2d Cir. 2011)...............................................................65

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006)...............................................................50

*United States v. Ramos-Atondo,*
    732 F.3d 1113 (9th Cir. 2013)...............................................................60

*United States v. Reyes,*
    302 F.3d 48 (2d Cir. 2002)...............................................................*passim*

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009)...............................................................90

*United States v. Richter,*
    826 F.2d 206 (2d Cir. 1987)...............................................................85, 89

*United States v. Rivera,*
    971 F.2d 876 (2d Cir. 1992)...............................................................70, 89

*United States v. Rodriguez,*
    983 F.2d 455 (2d Cir. 1993)...............................................................46, 59

*United States v. Roldan-Zapata,*
    916 F.2d 795 (2d Cir. 1990)...............................................................90

*United States v. Sanchez*,
659 F.3d 1252 (9th Cir. 2011)...................................................................84, 85

*United States v. Sanchez-Robles*,
927 F.2d 1070 (9th Cir. 1991).....................................................................46

*United States v. Schlegel*,
2009 U.S. Dist. LEXIS 20912 (E.D.N.Y. Mar. 16, 2009)...........................100

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007)..........................................................99, 100, 101

*United States v. Smith*,
46 F.3d 1223 (1st Cir. 1999) .......................................................................58

*United States v. Soto*,
716 F.2d 989 (2d Cir.1983).........................................................................65

*United States v. Spinelli*,
551 F.3d 159 (2d Cir. 2008)..................................................................80, 93

*United States v. Stahl*,
616 F.2d 30 (2d Cir. 1980)..........................................................................83

*United States v. Stein*,
2008 U.S. Dist. LEXIS 58024 (S.D.N.Y. July 31, 2008) ...........................101

*United States v. Steinberg*,
21 F. Supp. 2d 309 (S.D.N.Y. 2014).............................................................50

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003)..........................................................57, 64, 66

*United States v. Terry*,
702 F.2d 299 (2d Cir. 1983).........................................................................84

*United States v. Tocco*,
135 F.3d 116 (2d Cir. 1998).........................................................................89

*United States v. Torres*,
    901 F.2d 205 (2d Cir. 1990)..........................................................................109

*United States v. Truman*,
    688 F.3d 129 (2d Cir. 2012).............................................................................3

*United States v. Turoff*,
    853 F.2d 1037 (2d Cir. 1988)........................................................99, 100, 102

*United States v. Tutino*,
    883 F.2d 1125 (2d Cir. 1989)........................................................................91

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011)............................................................................2

*United States v. Universita*,
    298 F.2d 365 (2d Cir. 1962)..........................................................................90

*United States v. Valentine*,
    820 F.2d 565 (2d Cir. 1987)..........................................................................90

*United States v. Valle*,
    301 F.R.D. 53 (S.D.N.Y. 2014) ....................................................................87

*United States v. Walsh*,
    194 F.3d 37 (2d Cir. 1999)..............................................................................3

*United States v. Watson*,
    171 F.3d 695 (D.C. Cir. 1999) ......................................................................85

*United States v. Wong*,
    884 F.2d 1537 (2d Cir. 1989)........................................................................58

*United States v. Wright*,
    625 F.3d 583 (9th Cir. 2010)........................................................................74

*United States v. Young*,
    470 U.S. 1 (1986) ..........................................................................................91

**Statutes**

18 U.S.C. § 1029 ................................................................15

28 U.S.C. § 1291 ..................................................................1

United States Code, Title 15 ................................................1

United States Code, Title 18 ................................................1

**Rules**

Federal Rules of Criminal Procedure 8..............................102

Federal Rules of Criminal Procedure 8(a) ....................98, 99

Federal Rules of Criminal Procedure 8(b)...........................99

Federal Rules of Criminal Procedure 14......................98, 102

**Other Authorities**

Aristotle [*Rhetoric*, Book III, Part XIV]..............................86

Glanville Williams, *Criminal Law: The General Part*, § 57
    (2d ed. 1961) ................................................................45

Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance As A Criminal Mens Rea*, 81 J. CRIM. L. & CRIMINOLOGY 191 (1990).........48, 49, 50

Jed S. Rakoff, *"Why Innocent People Plead Guilty,"* The New York Review of Books, Nov. 20, 2014 ....................................11

John L. Kane, *"Plea Bargaining and the Innocent - It's Up to Judges to Restore Balance,"* The Marshall Project, Dec. 26, 2014] ...........................11

Case and Jurisdictional Statement

Appellant Daniel Bonventre appeals from a judgment of the Southern District of New York (Swain, J.,) convicting him after a jury trial of conspiracies to engage in securities fraud and related offenses, and substantive counts charging securities fraud, false record-keeping, bank fraud and false tax filings, and sentencing him to 120 months imprisonment. The district court entered judgment on December 16, 2014. A timely notice of appeal was filed on December 18, 2014. The district court had jurisdiction under Titles 18 and 15 of the United States Code, and this Court has jurisdiction under 28 U.S.C. § 1291 as an appeal from a final judgment.

Questions Presented and Standards of Review

1. Whether conscious avoidance is a permissible theory of guilt absent evidence of actual knowledge of wrongdoing for a defendant who was deceived by his superiors, where there was no evidence that he subjectively formed a belief in the wrongfulness of his employer's actions nor that he deliberately remained in the dark, and where the evidence showed only his actual belief in the truth of the representations?

2. Whether a defendant is denied a fair trial where the Government exploits the clamor surrounding a notorious case by engaging in misconduct in its jury

1

address with blatantly inflammatory and prejudicial rhetoric, and deliberate, repeated misrepresentations of a highly equivocal record as to the defendant's knowledge and intent?

3.      Whether personal tax charges that have no relation to the largest financial fraud of all time may be charged together in a joint trial to increase the likelihood of conviction on all counts?

4.      Whether the Government may deny particulars as to allegations of complicity in the largest Ponzi scheme ever, and identification of documents on which specific counts are based, then overwhelm the jury with evidence of the Ponzi scheme and with mountains of documents all unconnected to the specific counts charged in the indictment in a case spanning forty years and encompassing millions of documents?

          This Court reviews *de novo* the propriety of jury instructions and the sufficiency of their factual predicate, as well as failure to grant relief from prejudicial joinder of charges and questions of law.  *See United States v. Fofanah*, 765 F.3d 141 (2d Cir. 2014); *United States v. Litwok*, 678 F.3d 208, 216 (2d Cir. 2012);  *United States v. Tzolov*, 642 F.3d 314  (2d Cir. 2011); *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003).  Failure to order the government to particularize its allegations and grant a new trial for prosecutorial misconduct is

reviewed for abuse of discretion, *see United States v. Banki*, 685 F.3d 99, 119-20 (2d Cir. 2011); *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999), but this Court performs its own analysis as to the extent of the impropriety and its prejudicial effect. *See United States v. Truman*, 688 F.3d 129, 143-44 (2d Cir. 2012). Moreover, a court abuses its discretion when its decision "rests on an error of law or a clearly erroneous factual finding, or when its decision . . . cannot be located within the range of permissible decisions." *Id.* at 141.

<u>Introduction and Summary of Argument</u>

The conventions of appellate review that indulge the government's most favorable spin from a trial record are not a prosecutorial panacea for the errors in this case nor for the government's unrelenting misconduct. After a six-month trial of five former employees of Bernard L. Madoff Investment Securities ("BLMIS") based on conduct spanning forty years, a jury convicted all defendants of all submitted counts, including especially inscrutable overlapping conspiracies, after only about twelve hours of deliberation. The speed of deliberations in a case of such unprecedented complexity stands in vexing contrast with the district judge's rejection of the government's theory of the defendants' deliberate scheming with their boss: she concluded that the five employees, all but two of whom performed substantially different functions in the firm, had consciously

3

avoided the truth of Madoff's fraud (and sentenced each to fractions of the sentences adamantly sought by the government).  Perhaps it is conceivable, even if highly improbable, that five people in the same workplace might all consciously avoid the same truth.  But that same truth was unknown to thousands of others, most with far greater sophistication in the arcana of finance, and many armed with the world's finest lawyers and accountants trained to detect fraud.  As readily as the conventions of appellate review favor prosecutorial indulgence, they do not require that the reality of any particular case be ignored.

Since December 2008, when Madoff revealed that he had used his standing as a Wall Street icon to camouflage a Ponzi Scheme and defraud thousands of investors of billions of dollars, his name has become as synonymous with financial fraud as anyone who ever lived.  While some aspect of Madoff's fraud may have been apparent to his tight inner circle of wealthy benefactors, he succeeded, inconceivably, in deceiving luminaries of American enterprise, entertainment, finance, philanthropy and members of his own synagogue.  The scale and duration of the fraud was shocking, but exponentially more so because *Madoff* had done it.

The district court described the psychopathically two-faced Madoff as "extraordinarily devious and soulless, who "presented himself *inside the firm* as

4

all-knowing, all-capable and unquestionable."A13186, 13190, 13352. emphasis

added)]. The targets of Madoff's unrelenting deceit "inside the firm" included

employees who were the people in the world closest to him: his wife (who helped

with his firm's banking), his niece (an attorney and compliance officer at his firm)

and his two sons (who helped manage his firm's legitimate trading businesses),

but none of them was ever charged. Even the government acknowledged that

Madoff lied repeatedly to the five defendants in this case [A564], an undisputed

fact that should itself have given the jury pause if not reasonable doubt.

   The case against Appellant Daniel Bonventre was especially

perplexing. Though Bonventre was convicted of all submitted counts after

testifying on his own behalf over four days, the district court declined to find that

he committed *any* perjury (even by the preponderance standard applicable to

sentencing findings), concluding instead that his denials of willful misconduct

were consistent with conscious avoidance and thus not deliberately false. A13142-

47, 13190-92. More, the district court found that the government's indispensable

witness, Frank DiPascali, Madoff's erstwhile lieutenant, was (1) "insufficiently

credible to support a finding that Bonventre committed perjury" [A13146]; and (2)

an "insightful manipulator" and "glib storyteller, and [] an admitted and convicted

perjurer," "whose testimony regarding the overall structure and methodology of

the Madoff Securities fraud was generally credible and is widely corroborated," while his more "salacious details . . . are not." A13347. Even more, the district court agreed with Bonventre's testimony that Madoff used deceit, his iconic status and his unfailing generosity to inspire genuine trust and loyalty. A13190-91.

The notoriety of Madoff's Ponzi scheme required care to ensure that a fair trial was a reality rather than a sound bite for the prosecutors to patronize. But despite the need for the prosecutors to be faithful to the highest professional standards, their conduct, euphemistically characterized by the district court at one point as "aggressive strategies," fell well short of the mark. The denouement of the government's pervasively improper rebuttal summation was an unfathomable call to action grounded in racial injustice: the African-American prosecutor expressly urged the jury (including six African-Americans and one Latino) to muster the courage to convict the five well-paid White defendants, just as the Honorable Constance Baker Motley (the trial judge's mentor) had mustered the courage to fight injustice in the South before her service in the Southern District was commemorated by naming the Courthouse's jury room in her honor.

Lest that overture be mistaken as a forgivable moment of spontaneous passion, the same prosecutor (sometimes acting with his equally "aggressive" trial partners) (1) deliberately flouted rulings of the district court; (2) routinely made

faces and smirked during the trial, exploiting the government's close proximity to

the jury box; (3) dwelled repeatedly on meaningless facts to create an impression

of scandal; and (4) had been previously rebuked for misconduct by at least one

other judge.  Perhaps some of the government's shenanigans can be dismissed as

the rough-and-tumble of a contentious trial unworthy of this Court's concern, but

the irreparably prejudicial rebuttal tipped the scales, rendering the trial

unsalvageable.

      The fairness of the trial and the reliability of its result also depended

on the trial court's effectiveness in checking the government's "aggressive

strategies."  But the district court's  undue deference to the government was

abused and ultimately overcome by the noxiousness of the government's win at-

any-cost approach.  The jury reached its swift verdict because of a toxic cocktail of

Madoff's infamy and over-reaching prosecutors, not because of its care in sifting

through evidence against five defendants spanning forty years.

      The case against Bonventre shows how readily the reliability of fact-

finding can be compromised by prosecutorial over-aggressiveness, even if

disputed issues of fact are typically beneath an appellate court's radar.  Because

Madoff opposed titles for his employees, Bonventre identified himself as Director

of Operations to facilitate his contact with counter-parties in the firm's broker-

7

dealer business, in which hundreds of thousands of real trades were indisputably made sometimes in a single day, and the innovations of which were the envy of Wall Street, creating the mystique that Madoff used to camouflage his true colors. A9659, 9678-81, 10214-15. Bonventre *never had any contact* with investors in the firm's investment advisory ("IA") business (the locus of the Ponzi scheme), had no role in creating the false account statements and trade confirmations sent to IA clients nor in selecting the purported trades that Madoff executed on their behalf, and *never* met with an auditor or regulator. A9698. Indeed, when the Securities and Exchange Commission ("SEC") investigated BLMIS in 2006, two years before its collapse, only Madoff and cooperator Frank DiPascali were deposed, Madoff having directed DiPascali to deflect the SEC's interest in taking the testimony of anyone other than them. A7051-52, 7061-62.

Bonventre testified at trial that he saw Madoff as an exceptionally magnanimous industry titan [A9633, 9665] and believed his representations that (1) trades in the firm's IA business were made overseas [A9654]; and (2) Madoff had broad discretion as a sole proprietor to transfer assets and liabilities between his broker-dealer and IA businesses. A9717-18, 9762. Consistent with the unchallenged belief of even the government's witness [A6858-60], Bonventre believed that Madoff had authority to allocate profitable trades to employees from

8

bulk purchases in an omnibus account [A9779-882], and did so for Bonventre's benefit on three occasions between 2002 and 2006. Bonventre further believed that Madoff bestowed him with gifts, advances and compensation to reward his longtime service, not as payment for deliberate participation in wrongdoing. A9678, 9806-07, 9829.

The district court expressly rejected the government's claim that Bonventre was a high-level decision-maker who deliberately schemed with Madoff. Instead, consistent with her views of the other defendants, she found that Bonventre willfully blinded himself to the fact that the Madoff's IA business was not conducted in the manner represented to investors, and that he was too obedient to and trusting of Madoff and insufficiently skeptical. A13146-49, 13178-81, 13188, 13190-92, 13195. Likewise, Judge Swain rejected the government's oft-repeated claim that Bonventre was so key a player in Madoff's fraud that he was among the first to have advance warning of the firm's collapse in December 2008, or that activity in Madoff's bank account made the impending collapse apparent to Bonventre. A13141. The court also rejected the significance of Bonventre's self-bestowed title of Director of Operations, and the government's insinuations that an inference of guilty knowledge flowed therefrom. A13133, 13180.

9

A key witness against Bonventre was Enrica Cotellessa-Pitz, the firm's controller, who worked closely with him for much of her thirty years at the firm. Her path to cooperation and a guilty plea was a torturous one; prior to being charged, Cotellessa-Pitz proffered with the government some fourteen times over two and a half years, repeatedly professing her innocence and other facts aligned with Bonventre's defense. A4256, 4475-76. In a heart-rending letter to the prosecutors (discussed and reproduced *supra*), Cotellessa-Pitz responded to the government's threat to indict her if she did not agree to cooperate, by begging them to accept the truth that she was deceived by Madoff just like so many thousands of others, was innocent of wrongdoing and had never intended to commit any crime. A4257-65. At trial, Cotellessa-Pitz froze on the stand when confronted with her prior exculpatory statements, pausing interminably when trying to square them with her eleventh-hour capitulation to government pressure. The government narrative of Cotellessa's knowing and longtime participation in a massive fraud is as contrived and irreconcilable as the dichotomy the district court recognized between Bonventre's good nature and his own knowing participation in Madoff's fraud.

Likewise, cooperating witness David Friehling, Madoff's outside accountant who signed off on the firm's financial audits, pleaded guilty only after

offering a similar account that he too had believed and trusted Madoff, and was

unaware of his deceptions.  A3346-48, 3404-06, 3414-16.  More, while Friehling

had admitted to making false representations in his purportedly independent

financial audit (which did not involve Bonventre), he only began implicating

Bonventre in a separate area (manipulating the firm's financial records in response

to an IRS audit of Madoff's personal tax returns) after being charged and thus

mindful of the need to offer up substantial assistance.  A3404-3416.  The

difference between Bonventre on the one hand, and those like Cotellessa-Pitz and

Friehling, on the other, was that the latter succumbed to government pressure and

saw no choice but to accommodate its cynical theory of the trial defendants'

deliberate complicity in Madoff's fraud – which was absolutely not the truth.

      Even with the growing recognition that innocent people plead guilty

[*see, e.g.*, Jed S. Rakoff, *"Why Innocent People Plead Guilty,"* The New York

Review of Books, Nov. 20, 2014; John L. Kane, *"Plea Bargaining and the*

*Innocent - It's Up to Judges to Restore Balance,"* The Marshall Project, Dec. 26,

2014], the conventions of appellate review serve to indulge the government's use

of its power in this case to secure favorable but unreliable testimony.  But

prosecutorial tactics that impaired the reliability of fact-finding are entirely

appropriate to consider when this Court determines whether the errors in this case

11

were harmless and isolated, or were prejudicial and part of a deliberate or reckless strategy to exploit the clamor surrounding Madoff's fraud rather than correct for it. The celebrity of this case was reason for the government to tread carefully, not to exploit the "moral panic dynamic" this Court has warned against [*Friedman v. Rehal*, 618 F.3d 142, 158 (2d Cir. 2010)], nor to encourage the jury to get swept up in revulsion to obtain convictions.

I   STATEMENT OF THE CASE

A.   Background

Bonventre worked at Bernard Madoff's firm for forty years, beginning in 1968 as a bookkeeper, when he was about twenty-two years-old, and continuing until March 2009, months after the Ponzi scheme was revealed, and a Trustee had been appointed to liquidate the firm's assets.  A9632, 9658, 9661. He had no other experience in the securities industry, having worked briefly in the 1960s for Bank of America in a clerical capacity.  A9661-62.  Everything he knew, he learned from Madoff.  Bonventre graduated high school, but received only a two-year associates degree in accounting from a local community college, after completing most of his class-work in 1964 and 1965.  A9663.  Because he worked days and took classes at night, it took about six years to complete the degree.  In the intervening forty years that Bonventre worked at Madoff's firm, he

12

completed no other coursework, held no certificates or industry licenses, and did

not attend continuing education or other training for his position.  A9663.

      In the beginning, Bonventre, as one of only a handful of employees,

worked closely with Madoff on a regular basis, but their closeness receded over

the years.  A9634.  Together, Madoff and Bonventre, along with others, built up

the firm's market-making operation into an innovative, trail-blazing trading

platform that reshaped Wall Street and earned Madoff iconic status.  Even

DiPascali described the broker-dealer business as a state of the art, technologically

advanced legitimate global business.  A7067-68.  Its success and Madoff's renown

lent credence to the later artifice he employed that he was executing his IA trades

overseas: it was credible because Madoff had the *bona fides* of having developed a

sophisticated trading infrastructure capable of handling precisely such activity.

A7068.

      The high esteem the outside world bestowed upon Madoff –

evidenced by his chairmanship of NASDAQ, office visits from Senator Schumer

and other dignitaries [A6505-07, 7477], closeness with regulators, and positions

on the boards of numerous charities  – was even greater within the firm itself.  If

Madoff was a highly respected icon to the outside world, he was like a God to his

employees, "more or less like a higher being," as one government witness

13

quipped.  A7390.  Bonventre respected and trusted Madoff because he had

everyone's respect:  "He seemed to have the respect of the entire world, the way I

viewed it."  A9632-33, 9665.  According to Bonventre, Madoff  "appeared to be

the most magnanimous, caring individual.  Took care and understanding

everybody's lives and names of their children and was amazing to watch,

philanthropic outside of the firm, very empathetic individual.  That's at least what

he appeared to be."  A9650.  Bonventre's assessment of Madoff's generosity was

confirmed by numerous other Madoff employees who testified at trial.  A1303-04,

3078; Trial Transcript at 2526-27, 2649, 2659

 Madoff cultivated a family-friendly atmosphere; employees were

treated like family, which was literally true in many cases because employees *were*

members of employees' family.  Among members of Bonventre's family who

worked at the firm was his stepson, Mark (the son of Bonventre's first wife who

herself was one of Madoff's original employees in the 1960s), who worked there

about seventeen years as a trader in the firm's market-making business.  A9853.

Bonventre's other stepson, Jeffrey, worked at the firm for twenty years.  A9635.

The government introduced evidence that Jeffrey slept on the job, which it initially

insinuated was permitted by Madoff as a *quid pro quo* for Bonventre's knowing

participation in the fraud, but the government abandoned that theme when

14

Bonventre established that he helped Jeffrey recuperate from an addiction to cocaine that had exacerbated his sleep apnea. A9637. Indeed, Madoff fired Bonventre's cousin Peter, who proved to be an unsuccessful trader. A9644. For a short time during summers or school breaks, Bonventre's son Daniel likewise worked at the firm, and Bonventre had hoped that he would eventually join the broker-dealer business.[1] Over the years, Madoff explained to Bonventre that he was building the broker-dealer business as a legacy for his family, and that while his sons Andrew and Mark would run the trading room, Bonventre's sons would run the firm's back office. A9652.

B.    Bonventre's Role in the Broker-Dealer Business

Business at BLMIS was heavily compartmentalized into separate divisions: market making and proprietary trading, and IA. The IA business was where Madoff ran his Ponzi scheme. Bonventre, however, was employed in the market-making and proprietary trading business, a legitimate enterprise in which hundreds of thousands of genuine trades were typically made on a daily basis. A9680. While at times Bonventre's responsibilities indirectly involved the IA

---

[1] The government had alleged that Bonventre arranged a "no-show" job at BLMIS for his son Daniel to facilitate his health insurance after he graduated from college and was no longer a dependant. Even though Bonventre had nothing to do with ERISA forms that reported the population of covered employees, the government charged him with making false statements in documents required by ERISA (18 U.S.C. § 1029), but the district court dismissed the counts because the government introduced no evidence that he was even aware of such forms. A12757.

15

business, located on the 17ᵗʰ Floor (whereas Bonventre's office was on a different floor) usually for ministerial or other non-discretionary functions, Bonventre had little to nothing to do with the IA business overall.  As to the broker-dealer business, Madoff was fastidious about strict compliance with applicable rules and regulations, and indeed had himself contributed to writing many of those rules. A7101, 9665-68, 9690, 10189.  Madoff further cultivated the impression that his high-level contacts – for example, the chairmen of the Securities and Exchange Commission and New York Stock Exchange – were sufficient to deflect any unwanted scrutiny from auditors or regulators.  A7072-74, 13144.

            The lion's share of Bonventre's responsibilities did not touch on the IA business (and thus the Ponzi scheme).  Bonventre's primary responsibility was overseeing the clearance and settlement of trades in the broker-dealer business. A9680, 10214-15.  He described his work as follows: "[E]very single one of those 500,000 trades [that occurred daily in the broker-dealer business] is a separate contract, and you have to follow that contract through to clearance on a settlement date that usually, typically, would be three days after the trade was executed.  So you had to follow that through.  You had to make sure that the contract broker knew exactly all the same information that you knew on the trade, and then make sure that the deliver and receive of those securities were made and paid for."

16

A9681.  The normal course of business for Bonventre, therefore, was in the broker-dealer business, the prism through which he viewed everything else. A3544-45.

Bonventre eventually gave himself the title of "Director of Operations" as a way to identify himself and his competencies when dealing with counter-parties at other broker-dealers, clearing corporations and banks.  A9658-59.  Bonventre's authorities, however, did not extend to the IA business, and he did not hold himself out as Director of Operations for the IA business, which he understood was overseen by DiPascali and Madoff.  A9660.  Madoff was not fond of job titles for his employees, and directed Bonventre to remove the title from the business cards he had printed.  A9659.  Bonventre complied, but continued to refer to himself as director.  A9659.

In addition to operational tasks in the broker-dealer business, Bonventre had other responsibilities, including preparation and maintenance of the broker-dealer's general ledger, which he simplified to mean the firm's statement of net worth, reflecting its assets and liabilities, and on which he began working around the year 2000.  A9679-89, 9993.  He was also responsible for maintaining or verifying the stock record of the broker-dealer business, which indicated the positions in securities held by the firm.  A9993, 10024-25.  Cotellessa-Pitz

17

testified that the "stock record, like the general ledger was the cash balances, the

stock record was the inventory balances.  Essentially, it was our securities

positions, long positions versus short positions.  It kind of works the same way as

the general ledger, only in stock positions, in that what you have on one side, there

is a corresponding entry on another side.  So two sides have to balance."  A3912.

C.    Bonventre's Limited Contacts with the IA Business Did
      Not Provide Him with Knowledge of Any Wrongdoing

There were instances when Bonventre's work required dealing with

aspects of the IA business.  For example, Bonventre would ensure that holdings –

real positions in securities –  in the broker-dealer business on behalf of IA clients

were properly maintained.  A9698.  Elsewhere, in the latter years just before the

firm's collapse, he occasionally helped and than assumed the role of Madoff's

wife Ruth in reconciling the thousands of entries on IA bank statements (the

"Chase 703 Account").  A9690-91.  Reconciling the account statement amounted

to matching debits and credits, which Bonventre analogized to a household

checking account on a much larger scale.  A9691, 10199, 4053.  The document

showed checks and wire transfers moving into and out of the account, but did not

reveal information on how the underlying funds were generated, nor whether the

IA business was executing real trades.  A9692.  Reconciliation was a largely

18

ministerial task that did not require or entail efforts to inquire into the source or provenance of the underlying transfers into the account.

Nor would the Chase 703 statement have reflected the entirety of Madoff's trading in the IA business or otherwise. A9692-94. To address an issue at sentencing, Bonventre submitted an affidavit [A13123-26] from an expert with vast experience in the securities industry who had reviewed 703 Account statements:

> Bank accounts of investment advisors like the Chase 703 account typically represent cash balances, debits and credits, not transactions in securities, and represent only a piece of the puzzle. Records of stock purchases and sales are typically recorded by a separate broker-dealer entity that executes the purchases and sales of securities and reports them to their clients on separate trade confirmations and brokerage statements . . . Based on analysis of the Chase 703 statements alone, it would be impossible to determine whether or not the investment advisory business at Madoff Securities did or did not involve the execution of securities transactions on behalf of its clients, which would not have been reflected on the Chase 703 statements.

> Chase 703 statements that I have reviewed contain entries that are typical for an investment advisor. The statements show that cash was invested in United States Treasury Bills, excess cash was swept on a nightly basis into commercial paper for the benefit of daily interest, and short-term derivatives were purchased as a means of cash management. These typical types of transactions would contribute to the conclusion that the statements were generally unremarkable and not a red flag of any type of fraud.

19

A government witness at trial, the firm's relationship manager at Chase, concurred with that assessment.  A6607.

At other times, Bonventre recorded or made entries of IA funds on the books of the broker-dealer business at Madoff's direction.  Because the broker-dealer business produced income for other Madoff businesses, Madoff explained to Bonventre that it was proper to recognize other businesses' expenses in the broker-dealer business.  A9761-62.  Similarly, Cotellessa-Pitz understood that commissions, or so-called "commission equivalents," from trades which she too believed were made in the IA business overseas were reflected on the books of the broker-dealer business.  A3935, 4303, 4320.  She, like Bonventre, once inquired of Madoff about commission equivalents, a question which Madoff successfully parried.  A3935.  Madoff dictated where the commission equivalents would go and how they would be booked, explaining that they had been earned on overseas trades.  A4320-21.

Madoff explained to Bonventre that, as a sole proprietor, he had the discretion to book income and expenses between his firm's component businesses as he wished.  A9718, 9761-63.  Madoff  provided that same explanation to Cotellessa-Pitz, who told her "not to worry."  A4263, 4295, 4319-20, 9598.  Cotellessa-Pitz told the government that "Madoff reiterated to Bonventre and [her]

20

that he was a sole proprietorship and could allocate expenses however he wanted."
A9598. Cotellessa-Pitz, like Bonventre, did not believe such practices were out of
the ordinary for a sole proprietor. A9598-99. Nor, like Bonventre, was
Cotellessa-Pitz told that revisions or restatements of the firm's books and records
were for the purpose of concealing anything in the IA business. A9599. The
explanation was credible to Bonventre because over time, the process of recording
IA income in the broker-dealer business changed, because of Madoff's professed
concern, voiced constantly, that it be done properly and in accordance with
applicable regulations. A9718, 9763.

Despite the virtual impossibility that Madoff would have deliberately
revealed his fraud to employees he was trying to dupe, Cotellessa-Pitz recounted a
meeting in which Madoff purportedly said in Bonventre's office, "You all know
what we do here," a comment that Bonventre did not hear or recall. A3934.
When Cotellessa-Pitz later inquired of him what Madoff meant, Bonventre
suggested that she should ask Madoff, but did not hear further from her about it.
A9759-60. Cotellessa-Pitz testified: "I was not really sure what we do here. I was
in this position. I was almost embarrassed because I felt that my boss -- I did not
know what to think of that, and it was kind of that situation where you think you're
supposed to know what your boss is referring to and you don't, and you just keep

21

quiet because you don't know what he's talking about, and there was a silence in the room. Nobody was saying anything." A3934-35. There was nothing inculpatory about it.

Bonventre had virtually no substantive role with respect to audits and regulatory investigations; any participation in those activities was indirect and circumscribed. For example, when the SEC audited the firm in 2005, Bonventre determined who could best answer specific inquiries the SEC put forth, as Madoff asked him to do. A9756-57. When Cotellessa-Pitz asked Bonventre to compile a list of bank accounts from the firm's general ledger, it did not include the separate Chase 703 Account maintained for the IA business precisely because Bonventre did not believe he would be called on to provide information about the IA business. A9758-59. Cotellessa-Pitz confirmed at trial that the IA business was separate, with different books and records, that Bonventre never directed her to omit any Madoff bank accounts in relation to the list of accounts for the 2005 audit, and that because she too believed there were separate calculations for the IA business, there was no reason to include the Chase 703 Account in the firm's response. A4299-310.

D.   Bank Loans and Tax Audits

Bonventre acted as a liaison with banks, maintaining relationships with counter-parties at banks to ensure that the brokerage business could function. A4332, 9764.  Bonventre, however, was never responsible for day-to-day banking activities, overseen instead by the "cage," the central office that handled monetary transfers in and out of the firm.  A9765.  Indeed, when Bonventre's contact at Chase asked to speak to Madoff about the IA business, Bonventre relayed the request to Madoff, but was excluded frm the subsequent conference call.  A6610, 9766.

In 2005 and again in 2008, Madoff asked Bonventre to inquire of Chase whether the firm still had a previously existing line of credit, and to use bonds that Madoff owned as collateral for a loan to BLMIS.  A9766-69, 10206. From the documents that Madoff provided to Bonventre in order to procure the loans, it was impossible to determine that Madoff in fact did not own the bonds at issue.  A9769-70.  Even if it had, it was also undisputed that an investment entity may properly use bonds – even those belonging to a customer on margin – as collateral for a bank loan.  A9767-68, 9774-75.  Nothing was suspect to Bonventre about the fact of BLMIS borrowing money; it was how the industry worked. A10207, 6802-03.  The government's expert likewise confirmed that broker-

23

dealers frequently borrow money using stocks or bonds as collateral, and that they are permitted to borrow on margin. A3755-56, 3771. In fact, after the firm collapsed and the Trustee was effectively winding down business, Bonventre took the same step – using bonds that Madoff owned (to Bonventre's knowledge) as collateral – with the Trustee's full knowledge. A9772-74, 12724.

As to IRS audits of Madoff's taxes, Madoff informed Bonventre that the audit was covering a period of several years, and that he needed a balance sheet reflecting the numbers or positions on his tax returns. A9720. Madoff gave Bonventre a particular tax code section that purportedly authorized a "haircut" that Madoff wanted taken on his investment positions, and Madoff told him that such actions were legally authorized. A9720-22. A haircut was a common term on Wall Street in accounting and tax terminology, which Bonventre understood to mean reducing the value of a position to account for a lesser value it would generate if it needed to be liquidated immediately [A9721], and which a government expert likewise testified was a "reduction in the fair value of the investment based on the SEC's guidance." A3721-22. Madoff selected Bonventre for this kind of task precisely because he lacked the extensive accounting knowledge that might have caused him to question the propriety of Madoff's accounting practices in relation to his tax audits. Cotellessa-Pitz was likewise

24

convinced by Madoff's explanation of his entitlement of a so-called "blockage factor" in relation to his personal audits, a calculation which was arrived at or determined by Madoff or Friehling, not Bonventre or Cotellessa-Pitz.  A4320.

Similarly, Friehling confirmed that he would meet with Madoff (not in Bonventre's presence), who provided the number to use for his taxable income on the tax return, and that Friehling did not confront Madoff or otherwise express skepticism about the propriety of the haircuts Madoff included on his returns. A3132-35, 3418, 3423-25.  Friehling or Madoff provided the numbers to Bonventre, without indicating that what they were asking him to do was impermissible or illegal.  A3425.  Madoff informed Friehling that Paul Konigsberg, another outside accountant charged in this case, had blessed the haircuts as permitted by tax regulations, and Friehling had also been similarly informed by his father-in-law, Madoff's prior outside accountant, Jerome Horowitz.  A3419-20.  Neither Madoff nor anyone else expressed the idea that haircuts were fraudulent, nor did Friehling ever discuss it in those terms with Madoff or Bonventre.  A3412, 3419-21.  Madoff's practice of including a haircut reduction of his assets or income thus began before Bonventre's involvement in tax audits.  A3422.

Bonventre performed the calculations as directed, ensuring that the securities positions and prices that he was provided with were correctly reconciled and recorded.  A9723-24.  He did so twice, once in 2002 and again when asked in 2005, and spent no more than a few hours on the project.  A9723-24.  After completing his task, Bonventre placed the records in a box, marked it as relevant to the IRS audit, put his name on the outside, and sent it to storage, further defeating the inference that he had acquired guilty knowledge and intended to defraud the IRS.  A9723, 4311-12; GX 5000-2.

E.    Bonventre's Compensation

Over the years, Bonventre earned a significant salary as well as other benefits, which he believed were merited by the length of his tenure, his critical role in helping to develop the broker-dealer business, and because of Madoff's inherent generosity.  A9678.  Further, his compensation was consistent with what he believed was typical on Wall Street for those working for a successful broker-dealer.  A9829.  The government used his receipt of such benefits and the resulting tax implications as proof of Bonventre's complicity in Madoff's fraud, but they have nothing to do with each other.

Madoff maintained a "draw account" which he would use to fund various personal and firm-related expenditures, including payments to Bonventre.

26

Bonventre maintained a "draw schedule" reflecting the activity form the draw account, which he voluntarily turned over to investigators after the firm's collapse. A9699-701, 9811. Because it was more convenient to use the draw account to transfer funds, Bonventre at times did so, reimbursing Madoff by check thereafter. A9703, 9708-09. Bonventre thus had a flexible compensation arrangement with Madoff, whereby Bonventre was permitted access to funds in the draw account to meet needs that arose throughout the year, and to pay certain firm expenses directly. Bonventre believed that Madoff paid taxes on money in his draw account, but Bonventre did not believe that his use of any such finds created any independent tax obligation on him. A9811-12.

At the end of the year, Bonventre would write Madoff a check to cover the expenses, or they would otherwise be factored into his bonus, or declared on his personal tax returns. A8448, 9805-08, 9813-14, 9828, 12720-22. Bonventre learned during trial that records established that one of the checks written to Madoff had been deposited in a brokerage account maintained for Bonventre by a Madoff entity known as Cohmad Securities, but the government introduced no evidence that Bonventre had caused the deposit. A9815. Madoff also provided Bonventre with a loan on one occasion, which he then forgave, or with gifts that ordinarily would not have had tax implications. A9805-08.

27

Bonventre believed that other expenses paid by the firm, including a life insurance policy and Bonventre's membership in a golf club, were properly characterized as Madoff business expenses. A9823. Bonventre testified that because he came to learn that Madoff did not pay taxes on payments characterized as gifts to Bonventre, and that other benefits created a tax liability, he owes more in taxes than what he paid. A9826. But he denied that any tax deficiencies were willful.

From the 1970s until 2006, Bonventre maintained a personal investment account at the firm, overseen by Madoff, in which Bonventre invested approximately $1.5 million of his salary over the years. A9775, 9786. Bonventre did not make any investment decisions or have discretionary authority over such decisions. A9776. From 1992 onwards, Bonventre realized investment gains of approximately $1.8 million in his investment account based on three purported trades that Madoff had executed on his behalf. A9777-78. On the first occasion in 2002, Madoff informed Bonventre that he had executed a profitable trade in an omnibus account that he maintained, and was allocating part of it into Bonventre's IA account, providing Bonventre with details as to dates, shares, and prices. A9779, 9784-85, 10061-62. A bank representative who testified at trial confirmed that there was nothing unusual about an investment entity buying securities in bulk and then allocating the trades to customers individually. A6858-59. Bonventre's

28

belief was consistent with the permissibility of such practices. Such treatment was not unique to Bonventre; Cotellessa-Pitz, for example, likewise believed that trades made in her IA account were managed and executed by Madoff, and that he did the same for Bonventre. A4326-27.

Madoff instructed Bonventre to give information about the trade to personnel in the IA business to print a trade confirmation. A9780. A government exhibit reflecting the calculations for the trade accordingly contains Madoff's handwriting as well as Bonventre's. A9783, 12191-95. Bonventre was issued a 1099 form for tax purposes on the trade he understood to be a genuine securities position, and thus included the income on his tax returns as a long-term capital gain, taxed at a lower rate than ordinary income. A9779. The same course of events occurred again in 2005. A9781. After Madoff advised Bonventre about a trade, he called Annette Bongiorno in the IA business, and she requested that he write her a note reflecting what Madoff had said about the trade. A9781, 9784-85. Bonventre believed in the legitimacy of all three trades (the third occurring in 2006), and that Madoff had rewarded him as a token of appreciation for his work in the earlier years – when Bonventre earned a far more modest salary than in later years – in helping to develop Madoff's broker-dealer business into an innovative, world-class market-making outfit. A9782-83, 9804-07. Bonventre

closed the account in 2006 in order to purchase a vacation home in New Jersey, as the district court found at sentencing. After the firm's collapse, Bonventre voluntarily provided documents relating to his trading activity and brokerage accounts in response to an SEC subpoena. A9790-91.

F.    Bonventre's Inquiries and the Lack of Any Red Flags

Over the years, Bonventre asked Madoff why he conducted various aspects of his business as he did. For example, Bonventre once inquired why Madoff would execute his IA trades in Europe when he had built a sophisticated trading platform in New York, where the trades could be settled and cleared more inexpensively and efficiently. A9653-54. Madoff said that doing so allowed him to maintain vital industry relationships and contacts, which Bonventre credited. A9654. Bonventre then inquired why, if he wanted the trades to be executed in Europe, they could not be cleared and settled in New York for much less. A9654-55. With Madoff's permission, Bonventre put together a proposal along with a BLMIS computer programmer named Sally Battalion, which took several months, about how to accomplish such a project. A9655, 10197-98. After Madoff failed to respond, Bonventre inquired again, but was told by Madoff that he liked the way things were, which was typical in other situations of Madoff's resistance to

30

change.  A9655-56.  Madoff, of course, had frequently invoked his sole proprietor

status with Bonventre, and the flexibility or discretion it provided him.  A9718.

Bonventre also asked Madoff about the firm generating its own

Depository Trust Clearing Corporation ("DTC") statements (later shown to

auditors, which Bonventre did not realize until after he was charged), which

Bonventre told Madoff was costly and unnecessary, since it was done

electronically.  A9657-58, 9900.  Bonventre believed at the time that Madoff had

agreed with him and ended the practice.  A9657-58.

Having read two articles from 1992 and 2001, in the Wall Street

Journal and Barrons respectively, the fact that Madoff managed billions of dollars

in investor money as part of his IA business was a matter of public knowledge,

and also known to Bonventre.  A9751-52, 12716-19.  Thus, when the government

alleged that Bonventre participated in hiding the scope of Madoff's IA business

from regulators – by, for example, concealing information in an SEC "FOCUS"

Report showing the state of BLMIS' financial condition, it is far more natural to

credit Bonventre's belief that the FOCUS Report was not designed to reflect

Madoff's IA business than the government's allegation that he was helping to hide

what had already been widely publicized.  A7078-80, 9752-56, 10179-80.  In any

event, Bonventre had virtually nothing to do with FOCUS reports, as they were

31

prepared and signed by the firm's controller, Cotellessa-Pitz, and before her, Irwin Lipkin. A4290-94.

Likewise, when the government confronted Bonventre with a purported red flag in the two articles – that Madoff promised investors unusually high and consistent annual returns between 13% and 20% (a purported red flag known to Madoff's investors and auditors), the articles established that the SEC's concerns were addressed because the investment funds managed by Madoff had been accounted for. A10186-87. No one - investors, regulators nor Bonventre - ever dreamed that Madoff was running a Ponzi scheme.

Through his years at BLMIS, Bonventre never met with nor had substantive contact with IA clients, auditors or other regulators. A9698, 10214. He was lied to on a daily basis by Madoff. A9658. Even DiPascali admitted that Madoff had directed him to mislead Bonventre about certain matters or otherwise not to tell him about others. A7011. Not only did Bonventre not know or suspect that Madoff was running a Ponzi scheme or had engaged in fraud, but the thought did not dawn on him until after it was revealed to the world. A9660, 9863. The pieces make more sense now – Madoff, for example, was described as secretive and obsessive, and overly concerned with confidentiality [A4160] – but at the time, they were the idiosyncracies of an icon.

32

Like Bonventre, even the cooperators were ignorant of Madoff's Ponzi scheme. Friehling was shocked to learn of Madoff's arrest, and disclaimed knowledge of the existence of the Ponzi scheme, maintaining his belief that Madoff had been running a legitimate securities brokerage. A3145-46, 3258, 3302-03. Even DiPascali did not realize that Madoff had been engineering a Ponzi scheme, though he was uniquely aware that the IA was an artifice as the only person whom Madoff appears to have significantly involved. A5659-65, 6268. DiPascali falsely testified to the SEC in 2006 that he believed that Madoff's business was wholly legitimate, and pled guilty to perjury among his other crimes as part of his cooperation agreement with the government. A4770-71, 5755, 7112, 7311.

Cotellessa-Pitz similarly did not know of Madoff's Ponzi scheme prior to his arrest. A4317. Like the others, she credited Madoff's explanations about his business practices, and believed and trusted him. A4334-36. It is difficult if not impossible to conclude from her testimony that she or Bonventre had acquired the guilty knowledge to which she later admitted, particularly after reading her letter to the government:

> The last time I was here, you told my attorney you were planning to charge me and advised that I should plead guilty pursuant to a cooperation agreement and 5K1 letter. Pleading guilty to a felony

33

conviction is something I never thought I would have to face, and I sit here before you asking you to reconsider that decision. In the last 2 ½ years, I have lost my career and all of my life's savings, I am unemployable in any industry, the Madoff trustee is posed to take any remaining assets I have, my online reputation is awful, I have taken on extraordinary debt with household income at 1984 levels, I don't know how I will pay the college loans for my daughter's education – I am basically destitute. Adding "convicted felon" to that list will be the final nail in the coffin for me . . . I won't even be able to do the volunteer work I do at my sister's elementary school – she can't have a felon on her premises. I have tried to be helpful to you and I'm sorry if I came up short. You have shown me many things that came past my desk that I now realize, in retrospect, were perhaps illegal, but please know that I never had intention to commit a crime. I was used by Bernie and just didn't see the extent of my actions at the time. Hindsight is always 2/20 and what may seem obvious to everyone now, was not apparent at the time it was occurring.

My attorney has explained to me the value of a 5K1 letter. ~~and I am grateful to be offered one.~~ I know it may be considered a "get out of jail free card", but it is not a guarantee, particularly with the public and judicial sentiment surrounding this case. Even though I was not part of the Ponzi scheme, the judge would have to recognize that fact – it still won't guarantee him/her not sentencing me harshly. If you truly "do not want to hurt me," the only guarantee I have that I would not be sent to jail, is for you to *not* charge me at all. I know you are aware that I was *not a participant* in the Ponzi scheme – I lost all of my life's savings despite many red flags that have been brought to my attention after-the-fact. And that, I think, is the key to my place in all of this. When I was asked to do thing for Bernie or others, I did them. I accepted the explanations given to me by Bernie because, not only was he my boss, but he was a revered financial professional who, I believed, was clearly smarter than I. According to Bernie, his unique position as a Sole Proprietor gave him *carte blanche* in his accounting methods. I wasn't an accountant, I wasn't proficient at analyzing financial statements and wouldn't dream of second-guessing anything he said. Is this failure on my part to perceive criminal intent or simply human behavior?

34

I know that I have signed many documents and my work product is everywhere. Isn't it obvious that I was being used because many others have little or no paperwork with their signatures or handwriting on them? In the vastly compartmentalized environment of Madoff Securities, we were kept almost completely uninvolved with one another – division was the essence of Bernie's plan and he succeeded. Perhaps this is where I have failed you most – because I could not tell you the complete history of how an event unfolded.

I, too, was duped in unspeakable ways. You might think that as an intelligent person I *should* have known, *should* have seen, *should* have questioned – but no, unfortunately – I did not. There may have been tasks that I executed that may have stepped on my moral integrity, but I never though they were illegal or criminal...something that I could go to jail for. The intent of any of these tasks was never criminal in nature.

I believed in and trusted Bernie like so many other people and industry professionals did. He manipulated them and he manipulated me. It is shocking to me to be thought of as "collateral damage" by someone who, I thought, loved and respected my family and me. I know you must know just about everything about me and how I live my life. I am an honest and ethical person who made a grave error in trusting and believing in Bernie Madoff. And now, for 2 ½ years I have trusted you and our justice system to see the truth of my position.

I ask you now to look at the whole picture, not just the compartments, before you proceed with any charges against me. I have lost so much already, my future looks grim, and now you think I should be a convicted felon as well. The results of that would be devastating. You know I was not part of the Ponzi scheme, yet if you charge me with a felony, the entire world will always believe that I was complicit in it. I am asking you to reconsider the possibility of that decision and not to betray the trust I have in you as seekers of the truth. You are empowered to decide my fate and I pray that your decision grants leniency to me.

35

A4225, 4257-65, 4279, 12621-23. As Cotellessa-Pitz acknowledged at trial, she wrote letters of complaint to the monsignor of her church, her Assemblywoman and a City Commissioner when she thought they were doing wrong or compromising her interests - a fact consistent with her letter to the prosecutors, and wholly inconsistent with silent acquiescence in Madoff's scheme. A4267, 4277-79. Indeed, she asked Madoff in 2008 if her retirement funds were safe, and was assured that they were. A4263.

G.    Bonventre's Innocence as the Firm Collapses

Bonventre's ignorance of the fraud is perhaps best exemplified in his actions just before the firm collapsed, and in the period after Madoff confessed and was arrested. For one, Bonventre last spoke to Madoff at least weeks before the firm's collapse. A9670. He last spoke to DiPascali in September 2008, months before the collapse. A9671. The next time they spoke was after Madoff was arrested, when DiPascali entered Bonventre's office to tell him that Madoff had confessed to him that he ran a Ponzi scheme. A9671. Thus, unlike DiPascali, Madoff made no such confession to Bonventre.

As the firm was facing the prospect of imminent collapse in the Fall of 2008, Bonventre was incurring greater obligations, having closed on a second home in New Jersey just days before Madoff's fraud was revealed. A9399, 9796-

36

97, 10213-14.  Bonventre expected to finance the significant mortgage obligation on that property with his continued salary from BLMIS, but instead was forced to put the property back on the market on December 16, 2008, days after Madoff was arrested and just two weeks after Bonventre had closed on it.  A9796-97.

This conduct was consistent with a lack of knowledge, as was his failure to cause checks to be issued to himself or otherwise grab the last chance to profit from Madoff's scheme amidst the fraud's unraveling – despite having signatory authority for the firm's bank accounts –  contrary to the government's portrayal of him as an erstwhile lieutenant of Madoff and knowing confidante and conspirator.  A4315-16, 7047, 9672.  DiPascali, in contrast, spent the weeks prior to and after Madoff's collapse continuing to enrich himself, issuing checks for himself and others, and destroying documents and records.  A5703, 6424, 7047-79, 7093-94.

Even after the existence of the Ponzi scheme became public, Bonventre's conduct was inconsistent with that of a knowing conspirator – he continued to come to work at BLMIS, did not retain legal counsel, did not destroy any documents or records, worked with and assisted investigators to unpack what had occurred, helped the trustee sell the remaining portions of BLMIS, cleared and

settled trades that had been pending as of the firm's collapse, and answered all questions asked of him. A9670-73, 9706, 9792-93.

Bonventre spent hours and hours answering investigators' questions without a lawyer. A9792. He retrieved and provided account statements for the Chase 703 Account, suggesting to the investigators that the statements might help them unravel the fraud. A9793. He explained that when he withdrew the funds from his IA account in 2006, he had a queasy feeling because of repeated market crashes that occurred or bubbles that had burst, and that he had been a conservative investor. A9795-97. The government attempted to use these statements against Bonventre, but they and the context in which they were made was more probative of an innocent state of mind than of anything resembling guilty knowledge.

H.    The Government's Case and the Proceedings Below

As discussed above, the government's case against Bonventre relied primarily on the testimony of three cooperating witnesses, David Friehling, Enrica Cotellessa-Pitz, and Frank DiPascali. Each, for different reasons, presented compelling reasons to doubt the veracity and reliability of their testimony and whatever accompanying inference of Bonventre's guilt the government squeezed out. Friehling never established that Bonventre understood his actions in relation

38

to the audit of Madoff's taxes were fraudulent or calculated in any way to deceive the IRS. As to Cottellessa-Pitz, she vocally proclaimed her innocence before relenting to prosecutorial pressure, but in any event offered a narrative that confirmed Bonventre's account of his innocence more than it demonstrated his guilt. And for his part, the convicted perjurer DiPascali offered blatant exaggerations, half-truths and lies that were not only uncorroborated by the rest of the evidence, but often contradicted – and discredited by the district court. Elsewhere, his testimony did not touch on Bonventre at all.

DiPascali's tale of a dramatic conversation with Bonventre in 2006 over drinks or dinner at a restaurant in the lobby of their office building is a case in point for the district court's concerns that DiPascali was a "glib storyteller" who provided "salacious," but not credible details. A13347. Thus, DiPascali's claim that Bonventre asked him if Madoff had an exit strategy [from the fraud] and then stated his own cover story in the event he needed to explain himself to the authorities, was entirely unsubstantiated. Bonventre testified that such a conversation never happened, which *was* consistent with the lack of closeness between the two, and likewise consistent with the lack of any receipt or financial statement reflecting such an event, even though DiPascali regularly used his Madoff American Express card for precisely such an occasion. A9675-77. The

39

government, for its part, declined to cross-examine Bonventre about the purported conversation with DiPascali, even though his cross-examination stretched across three calendar days and often delved into minutiae and picayune nonsense.

DiPascali offered a similarly implausible story about a 2005 audit by the firm KPMG, during which Madoff and DiPascali visited Bonventre in his office for about 10 minutes to ask a few questions relating to trade reconciliations. According to DiPascali, he met with Bonventre at least several times, and Bonventre educated him on the settlement process, and prepped DiPascali to pose as the firm's director of operations. A7062-64. The characterization is simply untrue; Bonventre did not knowingly enable DiPascali to pass himself off as the firm's director of operations, and certainly not for the purpose of deceiving KPMG during the course of their audit. A9710. Further, whereas DiPascali testified that Bonventre had "schooled" him for two weeks in advance of the audit, Bonventre was on jury duty for the week in question and absent from the office for much of the time. A7065, 9714-15, 12723.

Bonventre was arrested and charged in 2010. The indictments against him were composed of two overarching sets of charges: those relating to securities and books and records violations of BLMIS, and tax violations relating to Bonventre's individual tax returns. The government superseded several times and

40

Bonventre was tried on an indictment charging him with conspiracies to defraud BLMIS IA clients (Count One); to defraud auditors (Count Two); to commit accounting fraud and defraud banks and the SEC (Count Three); to commit tax fraud by obstructing the functions of the IRS in relation to the audit of Madoff's taxes (Count Four); and on substantive counts of securities fraud and violations of the books and records requirements for broker-dealers and investment advisors in relation to the first three charged conspiracies; (Counts 6-14); filing a false FOCUS report with the SEC (Count Fifteen); bank fraud (Count 18); false personal income tax filings for 2003, 2004, 2006 and 2007 (Counts 20-23); and obstructing the functions of the IRS (Count 24).

After a six-month trial before the Honorable Laura Taylor Swain, along with four co-defendants, all longtime employees of BLMIS, the jury convicted Bonventre on all submitted counts. Bonventre was sentenced to 120 months imprisonment; his co-defendants received lesser terms. The cooperators thus far – Cotellessa-Pitz, Friehling, Craig Kugel, David Kugel, Paul Konigsberg and Eric Lipkin – have all been sentenced to time served, which represents no time at all. Frank DiPascali passed away in May 2015, before he was sentenced. This appeal followed, and has been consolidated with the appeals of Bonventre's four co-defendants at trial. While the co-defendants have not elected to file a joint

41

brief, Bonventre hereby joins in full in the appellate arguments of his trial co-defendants to the extent applicable to him.

POINT I

## THE COURT'S INSTRUCTION ON CONSCIOUS
## AVOIDANCE WAS PREJUDICIAL ERROR

Over defense objections [A12738-44], the court issued the following

instruction to the jury about conscious avoidance:

> In determining whether a defendant acted knowingly, you may consider
> whether he or she deliberately closed his or her eyes to what would
> otherwise have been obvious to him or her and acted with deliberate
> disregard of the facts. However, I caution you that the government
> cannot prove a defendant's knowledge of a particular fact merely by
> showing that the defendant was careless, foolish, negligent, inattentive,
> or reckless. To find knowledge on this basis, it is not sufficient that the
> particular defendant [may] not have tried hard enough to learn the truth.

> Thus, if you find that there was proof beyond a reasonable doubt that the
> defendant you are considering was aware of a high probability of a
> material fact's existence and that he or she consciously and deliberately
> took action to avoid learning the truth of that fact, you may find that the
> defendant had knowledge of that material fact. However, if the
> defendant actually believed that a particular material fact did not exist,
> then you may not conclude that he or she acted knowingly and you must
> acquit. It is entirely up to you, as the judges of the facts, to determine
> whether the defendant deliberately closed his or her eyes and any
> inferences to be drawn from the evidence on this issue.

> Lastly, in the context of a conspiracy, if you find that a conspiracy
> existed, before you may convict any defendant, you must find that the
> particular defendant you are considering knew there was an illegal
> conspiracy and that he or she intentionally joined it. You may not apply
> the principle of conscious avoidance as I have defined it to decide
> whether or not the defendant you are considering intentionally joined a
> conspiracy. You may, however, find that the defendant joined the
> conspiracy even if he or she did not actually know the details of the

43

> conspiracy's aims or unlawful objectives, if you find that the defendant consciously and deliberately avoided knowing the truth about the conspiracy's aims and objectives.

A11999-12001. While the court, as Bonventre argued below [A9536-37], should have included stronger language to ensure that the jury did not convict him for passive behavior as opposed to more conscious, deliberate action to avoid knowledge, the language of the charge on the whole is far less objectionable than the decision to include it. Therefore, Bonventre challenges the district court's decision to issue the instruction rather than its language.

A. <u>Legal Principles</u>

A jury may receive a conscious avoidance instruction only in limited circumstances where the defendant denies knowledge of material facts necessary for a conviction, and where the government establishes a factual predicate, permitting a rational juror to conclude beyond a reasonable doubt that the defendant was subjectively aware of a high probability of a material fact's existence and consciously avoided confirming it or learning the truth. *See United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) (quoting *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000)). Absent some purposeful contrivance on the defendant's part to avoid learning the truth, it should not be given. *See United*

44

*States v. Hilliard*, 31 F.3d 1509, 1514 (10th Cir. 1994); *United States v. Lara-Velasquez*, 919 F.2d 946 (5th Cir. 1990).

Conscious avoidance is appropriate not where there is some generalized suspicion on the defendant's part, but only where "it can almost be said that the defendant actually knew." *United States v. Jewell*, 532 F.2d 699, 704 (9th Cir. 1976) (quoting Glanville Williams, *Criminal Law: The General Part*, § 57, n. 6 at 159 (2d ed. 1961)). This Court has restricted the doctrine to the limited scope of instances that are the effective equivalent of actual knowledge, noting that willful blindness exists "only where it can almost be said that the defendant actually knew. He suspected the fact; he realized its probability; but he refrained from obtaining the final confirmation because he wanted in the event to be able to deny knowledge. This, and this alone, is willful blindness." *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002) (quoting authorities).

The government is not required to choose definitively between actual knowledge and willful blindness. *See United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995). That is, it can allege, as here, that the defendant had actual knowledge of wrongdoing, and in the alternative, that he consciously avoided such knowledge. Either way, however, the government is required to adduce a factual predicate, evidence from which it is possible for the jury to find beyond a

45

reasonable doubt the defendant's awareness of a high probability of the existence of certain facts, and that he deliberately avoided learning of them.  *See United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993).  Further, while the same evidence may rise to an inference of actual knowledge or conscious avoidance, the instruction may *not* be given if the evidence permits *only* the inference of actual knowledge, as evidence of actual knowledge creates no *per se* inference of conscious avoidance.  *See United States v. Nektalov*, 461 F.3d 309,  316 (2d Cir. 2006); *Ferrarini*, 219 F.3d at 157; *United States v. Sanchez-Robles*, 927 F.2d 1070, 1075 (9th Cir. 1991) (odor of marijuana in defendant's vehicle showed either her actual knowledge or no knowledge whatsoever, not conscious avoidance); *United States v. Giovanetti*, 919 F.2d 1223 (7th Cir. 1991) ("[W]hen the facts require the jury to make a "binary choice" between "actual knowledge" and "complete innocence," the ostrich instruction should not be given") (citing cases); *United States v. Beckett*, 724 F.2d 854, 855-56 (9th Cir. 1984).

        The Supreme Court recently took up conscious avoidance in a civil patent infringement case, importing the concept of willful blindness from its roots in criminal law.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011).  The Court conducted a broad survey of how conscious avoidance is used in the Courts of Appeals, and noted the common ground that the defendant have a

46

subjective belief in the high probability of the existence of a certain material fact, and that he take "deliberate actions to avoid learning of that fact." *Id.* at 2070. Defendants, however, have met with varying degrees of success when trying to avail themselves of *Global-Tech*. *See, e.g.*, *United States v. Goffer*, 721 F.3d 113, 128 (2d Cir. 2013) (rejecting argument that *Global-Tech* – which expressly indicated that conscious avoidance surpasses mere recklessness – required district court to instruct that recklessness was insufficient to constitute conscious avoidance).

In one sense, *Goffer*, 721 F.3d at 128, is right that *Global-Tech* "was not designed to alter the substantive law [but] simply describes existing law." *Global-Tech* did not announce a new rule as to conscious avoidance so much as it sought to codify or "synthesize[]" the dominant principles in the Courts of Appeal. *Id.* Thus, *Global-Tech*'s pronouncement that conscious avoidance requires "deliberate action" to avoid learning incriminating details recognizes a requirement that was always present in conscious avoidance jurisprudence, but has sometimes been applied more sporadically. *See United States v. Heredia*, 483 F.3d 913, 918 n.4 (9th Cir. 2007) ("A willfully blind defendant is one who took *deliberate* actions to avoid confirming suspicions of criminality") (emphasis in original); *United States v. Delreal-Ordones*, 213 F.3d 1263 (10th Cir. 2000)

47

("defendant [must have] engaged in deliberate acts to avoid actual knowledge of that operant fact").  Put differently, mere passivity is not enough; instead, willful blindness requires conscious, "deliberate actions" or "active efforts" to remain in the dark.  *See Global Tech*, 131 S. Ct. at 2071; *Giovanetti*, 919 F.2d at 1227-28.

This Court has acknowledged detractors of willful blindness.  *See Nektalov*, 461 F.3d at 315; *Reyes*, 302 F.3d at 54; *see also United States v. Alston-Graves,* 435 F.3d 331, 337 n.1 (D.C. Cir. 2006) ("[I]t is hard to see how ignorance, from whatever cause, can be knowledge. A particular explanation of why a defendant remains ignorant might justify treating him as though he had knowledge, but it cannot, through some mysterious alchemy, convert ignorance into knowledge.").  Others have also noted the paradox of knowledge even though the government fails to prove that the defendant had actual knowledge.  In an influential article, Professor Robbins argued that the various conscious avoidance formulations "comport with neither philosophical nor traditional legal concepts of knowledge."  *See* Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance As A Criminal Mens Rea*, 81 J. CRIM. L. & CRIMINOLOGY 191, 209-10 (1990).  He concluded that conscious avoidance – measured by the defendant's awareness of a high probability of wrongdoing – is akin to traditional *recklessness* rather than

48

criminal knowledge, which requires certainty and awareness of the existence of facts beyond subjective belief in their relative probability. *See id.* at 222-27.

Another strong critic is Justice Anthony Kennedy, who has argued that it impermissibly trods on the legislature's prerogative to define crimes. Whereas Congress requires that the defendant act knowingly, willful blindness permits a conviction on a Judge-made conception of knowledge, which differs appreciably from Congress' intention in using the term "knowingly." For example, the drug statutes prohibit knowingly importing a controlled substance into the United States, not awareness of a high probability thereof. *See Global-Tech*, 131 S. Ct. at 2072 (Kennedy, J., dissenting) ("Willful blindness is not knowledge; and judges should not broaden a legislative proscription by analogy"); *Jewell*, 532 F.2d at 706 (Kennedy, J., dissenting) ("When a statute specifically requires knowledge as an element of a crime, however, the substitution of some other state of mind cannot be justified even the court deems that both are equally blameworthy"); *Heredia*, 483 F.3d at 931 (Graber, J., dissenting); Robbins, *Ostrich Instruction*, at 194 ("[I]f the judiciary substitutes a lesser mental state for statutorily prescribed knowledge, then it encroaches on the legislative prerogative of defining criminal conduct").

49

B.    Conscious Avoidance was not meant to apply in this type of case

The willful blindness doctrine arose in Victorian England in two cases charging illegal possession of naval stores and allowing gambling on a hotel's premises.  *See* Robbins, *Ostrich Instruction*, at 196 (discussing cases).  It lay mostly dormant in the United States, with occasional and limited exceptions, until the 1970s, when it gained "new prominence" with the increase of federal drug cases.  *See id.* at 199.

Conscious avoidance has of course been wielded in the corporate or white-collar context, but typically not against employees following the directives of their employers.  Instead, it has been used to ensnare executives, principals and other senior personnel colluding to make discretionary, criminal judgments at the heart of those frauds: Bernard Ebbers in the WorldCom prosecution, Jeffrey Skilling and Kenneth Lay in the Enron case, Frank Quattrone at Credit Suisse First Boston, Michael Steinberg, Zvi Goffer and Michael Kimmelman in the SAC Capital and Galleon insider trading affairs, the President/CEO and Chief Financial Officer of Duane Reade; or Refco's counsel in a massive accounting fraud.[2]

---

[2] *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006); *Skilling v. United States*; 561 U.S. 358 (2010); *United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006); *United States v. Steinberg*, 21 F. Supp. 2d 309 (S.D.N.Y. 2014); *Goffer*, 721 F.3d at 128; *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013); *United States v. Collins*, 581 Fed. Appx. 59 (2d Cir. 2014).

50

Lower level corporate employees either have actual knowledge of wrongdoing, or advance the fraud unwittingly and unknowingly by following directives (manipulated like Bonventre) and are not charged (or end up cooperating like Cotellessa-Pitz). Where conscious avoidance has been used to convict low-level criminal participants of modest background, it has been more in cases charging narcotics conspiracies, or transport or receipt of stolen property, i.e. contraband cases. But it has *not* typically been used against underlings or employees following directives in a corporate context, as here. And for good reason – Madoff erected an artifice to keep his employees in the dark about his criminal actions. Nor, in contraband cases, do the leaders bother to conceal the illegal nature of the conduct from those they use; it is apparent enough so that the courier or the fence knows better than to ask.

In classic conscious avoidance cases, the nature of the activity is inherently suspect. For example, an offer of an unusually large amount of money to transport a suitcase from Colombia to the United States, the offer of a car lacking title documentation for an amount well below its value, or a wire transfer to an offshore account from an account with repeated cash withdrawals and infusions just under $10,000 in small bills are the sorts of conduct that might well raise an eyebrow. The circumstances arousing a defendant's suspicions are

51

apparent because of the very nature of the activity they were asked to undertake. The conduct may be innocuous, but should alert a participant to the probability that his actions are less than innocent, and the need to conduct at least some cursory inquiry to ensure that his actions are not criminal.

Here, Bonventre's conduct was not in that category of inherently suspect behavior. It was business as usual, perhaps idiosyncratic because of Madoff's particular preferences, but lacking in the sort of red flags in the examples provided above and discussed in further detail below.

C.   The Instruction on Conscious Avoidance
     Lacked an Evidentiary Foundation

On the one hand, the trial of five long-time employees of Bernard Madoff charged with facilitating his Ponzi scheme would appear to be the perfect vehicle for a willful blindness instruction. If not here, when? But such thinking ignores nearly the entirety of the record and merely indulges public perception of the events in question rather than their reality. If Bonventre were the sole protagonist to disclaim knowledge of wrongdoing, conscious avoidance might be more well-founded. He is in good company, however, as virtually no one else - the government, the SEC, auditors, regulators, other BLMIS employees, banks, investors, the media – knew of or consciously avoided knowledge of Madoff's

52

fraud.  Bonventre and his co-defendants have been effectively singled out.  But the conclusion that he acquired guilty knowledge requires a finding that something about his vantage point enabled Bonventre to see what no one else could.

That vantage point, however, was not the exalted, all-knowing perch that the government portrayed, but that of a modestly-educated, mid-level trusting functionary whose entire base of knowledge was what he acquired working for and with industry titan, Bernard Madoff, who misled, deceived and manipulated him on a regular basis, the same as he misled and deceived virtually everyone else.  Although "[r]ed flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance," *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (citing *Nektalov*, 461 F.3d at 316-17), in this case there were no flags waving for Bonventre, and they were not red.  What the government holds up in the aggregate and in retrospect (knowing now that Madoff carried out a massive fraud) were not red flags to Bonventre at the time.  They constitute suspicious circumstances only with the benefit of hindsight and dubious, unsupported inferences.

The evidence is simply absent that Bonventre subjectively was aware of a high probability of wrongdoing – even if the circumstances objectively would have been suspicious to a reasonable person, or should have been to Bonventre.

*See Heredia*, 483 F.3d at 919 n.6; *United States v. Griffin*, 524 F.3d 71, 80 n.8 (1st Cir. 2008) (noting that conscious avoidance is a subjective standard that queries what would have been obvious to the particular defendant at issue); *Nektalov*, 461 F.3d at 315 (same). To the contrary, the evidence is far more suggestive (even discounting Bonventre's repeated denials of knowing or ever suspecting that Madoff had been engineering a Ponzi scheme, which the district court declined to find perjurious) of Bonventre's innocence and actual belief that he was not breaking the law, and that Madoff was not seeking to defraud anybody.

   That Bonventre would have:

 written his name on a box to identify and preserve purportedly fraudulent documents;

 brought his sons and other relatives in to work with him at the firm;

 questioned Madoff at various points about his business practices;

 returned after Madoff confessed to work at the firm for months and answered all the investigators' questions; and

 failed to take advantage of the firm's collapse by writing checks to himself and destroying evidence, as did Madoff and DiPascali, not only defeats an inference of actual knowledge but precludes the possibility of his subjective belief in the high probability of criminality, and certainly beyond a reasonable doubt.

More, that it was effectively undisputed that purported red flags were grounded in reality and legitimate industry practices, including:

the permissibility of omnibus trading;

taking a "haircut" on securities positions as part of tax computations;

a sole proprietor's relative flexibility in accounting;

executing trades overseas as a result of Madoff's European infrastructure;

use of customer bonds as collateral for bank loans;

the legitimacy of the broker-dealer business and its separation from the investment advisory business; and

public knowledge of the scope of Madoff's IA business that Bonventre was purportedly helping to conceal, when considered against the larger background and context in which the events occurred, fails entirely to demonstrate Bonventre's subjective belief in any improprieties and, to the contrary, demonstrates his actual belief in the legitimacy of Madoff's practices and his own actions – which is enough to remove conscious avoidance as a viable theory of guilt.

It is well established that equivocal evidence as consistent with innocence as with guilt is insufficient to prove the defendant's guilt beyond a reasonable doubt, particularly as it relates to his knowledge and intent. *See United States v. Newman*, 773 F.3d 438, 455 (2d Cir. 2014); *United States v. Ogando*, 547

F.3d 102, 109 (2d Cir. 2008); *United States v. Lorenzo*, 534 F.3d 153, 160-62 (2d

Cir. 2008); *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005); *United

States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003); *United States v. Glenn*, 312

F.3d 58, 70 (2d Cir. 2002); *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.

1991). "Where the evidence viewed in the light most favorable to the prosecution

gives equal or nearly equal circumstantial support to a theory of innocence as a

theory of guilt, [it] necessarily fails to establish guilt beyond a reasonable doubt."

*Newman*, 773 F.3d at 455 (citing *Glenn*, 312 F.3d at 70); *see also United States v.

Coplan*, 703 F.3d 46, 69, 72 (2d Cir. 2012) (reversing conspiracy convictions

because evidence of intent "remains, at best, in equipoise"); *Mulheren*, 938 F.2d at

372 (reversing conviction upon evidence at least as consistent with innocence as

with guilt and inferences no more valid than others equally supported by reason

and experience).

       In contrast, where the doctrine of conscious avoidance has been used

properly, red flags or suspicious circumstances were so glaringly apparent and

obvious that there was little doubt as to the defendant's subjective awareness of

the high likelihood of wrongdoing, or that something was amiss. Such examples

include: *United States v. Fofanah*, 765 F.3d 141, 145 (2d Cir. 2014) (affirming

conviction for transporting stolen cars where defendant told witness that cars in

question were "no good" [i.e., stolen], and was aware that title documents did not match actual cars shipped, and engaged in conversation with undercover about shipping cars without genuine titles); *Goffer*, 721 F.3d at 127 (insider trading defendant present when co-conspirator told another he was "better off not knowing where [stock tips] were coming from" and defendant joked that tip came from a construction worker, creating false veneer of "plausible deniability"); *Nektalov*, 461 F.3d at 312-17 (defendant jeweler convicted for money laundering where prior cash transactions were in small bills, and where they "moved gold to Colombia" on behalf of an undercover law enforcement operative who defendant knew was selling "product [] in the streets"); *United States v. Morgan*, 385 F.3d 196, 205 (2d Cir. 2004) (listing 19 categories of suspicious circumstances sufficient to indicate knowledge that defendant was participating in drug conspiracy, including cash payments, offers by unnamed strangers, unusual travel itineraries, weight of luggage and defendant's lies about purpose of travel); *United States v. Svoboda*, 347 F.3d 471, 480-81 (2d Cir. 2003) ("tipper" in insider trading scheme was a friend of defendant tippee and credit officer at bank privy to inside information, where timing – only one day prior to tender offer – and success of trades was highly suspicious); *United States v. Abreu*, 342 F.3d 183, 186-88 (2d Cir. 2003) (defendant had "doubts" about provenance of the money in his

57

possession and admitted that he "chose not to ask any further questions"); *Reyes*, 302 F.3d at 51 (defendant admitted that he "looked away" as to whether undocumented airbags were stolen where he worked in a "product market dominated by stolen goods"); *United States v. Smith*, 46 F.3d 1223, 1237 (1st Cir. 1999) (defendant left discussion of his co-conspirators as to money laundering while stating "I don't think I want to hear this"); *United States v. Jewell*, 532 F.2d 697, 699-700 (9th Cir. 1976) (defendant declined stranger's offer of marijuana but accepted offer to drive from Mexico to Los Angeles in vehicle holding marijuana in hidden compartment that defendant had noticed but not investigated).

Not surprisingly, the evidence is equally as barren that Bonventre deliberately avoided confirming facts that he did not suspect or believe in the first place. Bonventre, like any defendant, must have deliberately "tried to close his eyes or ears to what was happening." *Beckett*, 724 F.2d at 856. But there is no need to *avoid* what is not coming for you, or even more so, what has been designed to be kept from you. Accordingly, there was no "purposeful contrivance" (seen in all of the above examples) on Bonventre's part to remain in the dark about Madoff's Ponzi scheme or other crimes. *See Kozeny*, 667 F.3d at 133-34; *United States v. Wong*, 884 F.2d 1537, 1541-43 (2d Cir. 1989); *United States v. Alvarado*, 838 F.3d 311, 314-16 (9th Cir. 1988). To the contrary, where

58

some aspect of Madoff's practices puzzled Bonventre, he asked Madoff about it. *See supra* at 27-29. Where a defendant's actual inquiries have been found insufficient to defeat a finding of conscious avoidance, the circumstances of the activity or conduct at issue have been by their nature, "patently suspicious," quite unlike here. *Compare Morgan*, 385 F.3d at 206 n.7; *United States v. Aina-Marshall*, 336 F.3d 167, 171-72 (2d Cir. 2003). But a defendant deliberately seeking to avoid confirming suspicions of Madoff's Ponzi scheme would not have asked him the particulars of trades, nor would he have asked expecting to be told lies.

The risk is too great that the jury convicted simply because Bonventre failed to take steps to confirm what he (and virtually no one else) never suspected, not that he acted to deliberately keep himself in the dark. Whether or not those actions constitute negligence, they do not amount to criminal knowledge or anything close to it. *See Rodriguez*, 983 F.2d at 458 ("the defendant must be shown to have decided not to learn the key fact, not merely to have failed to learn it through negligence") (citing *United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988)). *Ferrarini*, 219 F.3d at 157, prophesized the danger of using conscious avoidance in precisely this kind of circumstance:

[A] jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth. Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth.

Here, as the district court recognized, the jury was not presented with sufficient evidence that Bonventre had actual knowledge, and his conduct is best characterized by failing to ask the questions that could have made him aware of Madoff's fraud, which comes closest to mere negligence, not criminal knowledge. But even if omissions or the failure to ask questions or confirm certain facts can qualify as "deliberate actions" for purposes of conscious avoidance, *see United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013), the record only confirms that Bonventre *did* inquire and *did* ask questions, not that he was derelict in failing to investigate the existence of facts beyond his purview when no such duty existed in the first instance. "A criminal duty to investigate the wrongdoing of others to avoid wrongdoing of one's own is a novelty in the criminal law," which this Court should reject. *Heredia*, 483 F.3d at 928 (Kleinfeld, J., concurring). That is especially the case when the activity at issue occurs during the course of the defendant's employment where he is directed to take certain actions, and particularly where the superior in question is an industry icon like

60

Madoff. *See id.* ("The government has not conscripted the citizenry as investigators, and the statute does not impose that unpleasant and sometimes risky obligation on people").

      Permitting Bonventre's conviction to stand in the absence of evidence that he "[d]eliberately clos[ed his] eyes to what would have otherwise been obvious," [*United States v. Gansman*, 657 F.3d 85, 94 (2d Cir. 2011)], is to eliminate the distinction between negligence or recklessness, and criminal knowledge. In *Giovanetti*, 919 F.2d at 1227-28, Judge Posner summarized the need for some deliberate contrivance on the defendant's part that surpasses negligence:

> The ostrich instruction is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires. [It] can be a mental, as well as a physical, effort--a cutting off of one's normal curiosity by an effort of will. There is no evidence of either sort of effort here.

      Bonventre did not "fail[]to display curiosity, [and] he did nothing to prevent the truth from being communicated to him. He did not act to avoid learning the truth." *Giovanetti*, 919 F.2d at 1227. He remained in the dark not because he deliberately avoided knowledge, but because Madoff and DiPascali

61

lied to him and withheld information. The purposeful contrivance here was not his own in order to maintain plausible deniability, but that of his purported co-conspirators in order to keep him ignorant of their criminality. *See United States v. Kaiser*, 609 F.3d 556, 566-67 (2d Cir. 2010) (reversing and granting new trial because of erroneous conscious avoidance charge for executive whose reliance on information provided to him, and "unreliable" testimony of cooperators whose credibility the jury would have questioned); *United States v. Kaplan*, 490 F.3d 110, 120-25 (2d Cir. 2007) (error to provide conscious avoidance instruction where evidence pointed only to actual knowledge, not deliberate ignorance, and did not show that "knowledge of the fraud" had been "communicated to [the defendant]" nor how he would have acquired such knowledge); *Ferrarini*, 219 F.3d at 157.

    In sum, there was no evidence that Bonventre deliberately closed his eyes, and even less that Madoff's fraud was any more visible to him than to anyone else. Nothing in his background, his responsibilities, actions or his actual beliefs revealed Madoff's fraud to Bonventre with any semblance of clarity or suspicion. Whether the evidence permitted a finding that Bonventre was aware of a high probability that Madoff was defrauding his IA clients (or anyone else), it certainly did not permit that conclusion beyond a reasonable doubt. Courts have

allowed conscious avoidance to somehow bridge the gap, but all it supplies is a high probability, whereas due process requires that proof of every element or fact necessary to conviction beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).

    D.    <u>Conscious Avoidance Was Misapplied to the Conspiracy Charges</u>

        The inclusion of a conscious avoidance instruction raises an additional problem as to the four conspiracy counts against Bonventre. The district court instructed the jury that while conscious avoidance may be used to show that the defendant deliberately ignored knowledge of the aims of objects or objects of the conspiracy, it could not be used to prove his knowing intent to participate in it, i.e., his membership. A12000-01; *see, e.g.*, *United States v. Di Tommaso*, 817 F.2d 201, 218 (2d Cir. 1987) (evoking the two knowledge components of a defendant's intentional participation in a conspiracy). While the instruction may have been correct as a matter of law, the distinction between the two aspects of knowledge required for a conspiracy conviction has confounded Judges of this Court and the lawyers who appear before it to the point where it beggars belief to conclude that the lay jury properly understood and applied it.

        *Reyes*, 302 F.3d at 54 (citing cases), established that conscious avoidance can be used to show the defendant's knowledge of the purpose or

objectives of the conspiracy, but not the intent to participate in, nor membership in the conspiracy, quoting approvingly from *United States v. Mankani*, 738 F.2d 538, 547 n. 1 (2d Cir. 1984): "[I]t is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence[3][.]"  This Court has since reaffirmed *Reyes* as to the defendant's intent to participate in the conspiracy.  *See Morgan*, 385 F.3d at 206.  Moreover, the statement in *Reyes* was amply supported by citation to three prior cases in this Court, establishing that its limit on conspiracy prosecutions is firmly rooted in Second Circuit jurisprudence.  *See Reyes*, 302 F.3d at 54 (discussing boundaries of conscious avoidance in conspiracy prosecutions and citing cases).

       In addition to the danger that the jury convicted Bonventre on the conspiracy counts despite the government's failure to prove that he knowingly or intentionally joined the conspiracy, the instruction is in tension with the specific intent required to join a conspiracy.  Conspiracy is a specific intent crime, and guilt requires "some evidence from which it can reasonably be inferred that the

---

[3] The following year, in discussing *Reyes*, this Court said that conscious avoidance of knowledge of the illegal purpose of a conspiracy is, alone, insufficient to prove the defendant's intent to participate in the conspiracy, which must be accompanied by "further proof that the defendant joined in the illegal agreement with the intent of helping it succeed in its criminal purpose."  *Svoboda*, 347 F.3d at 479-80.  It added, however, that conscious avoidance can be used to satisfy the knowledge component of intent to participate in a conspiracy.  *Id.*

person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984) (citing *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983)). "Proof that the defendant knew that *some* crime would be committed is not enough." *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002) (emphasis in original); *see also Morgan*, 385 F.3d at 201.

Accordingly, the government needed to prove that Bonventre knew that he was engaged in a conspiracy not to commit some vague, ill-defined and poorly understood illegality or to advance *some* dubious venture of Madoff's, but specifically to defraud Madoff's IA clients by the means and methods identified in Count One, to defraud auditors and regulators by the means and methods in Count Two, to defraud banks and the SEC by the means and methods in Count Three, and to obstruct and defraud the IRS in relation to the audits of Madoff's personal tax returns for Count Four. Knowledge of *some* crime or criminal conduct is insufficient, as the government is required to prove the defendant's knowing participation in the particular scheme alleged in the indictment and his or her specific intent. *See United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2011) (the defendant must know the "specific nature of the conspiracy or underlying crime"; proof of knowledge of "some crime" is not sufficient); *United States v. Hassan*,

542 F.3d 968, 982 (2d Cir. 2008); *Newman*, 773 F.3d at 455 (voiding conspiracy convictions for lack of proof of defendants' specific intent to violate underlying substantive statute); *Lorenzo*, 534 F.3d at 160-62 (voiding convictions for lack of proof of defendants' knowledge of nature and specific objects of the conspiracy); *Ceballos*, 340 F.3d at 124 (reversing conviction for conspiracy to bribe public official for lack of intent premised on clear, unequivocal evidence of knowledge).

That the government satisfied this high burden through a theory of Bonventre's conscious avoidance is an inference that cannot be drawn from the factual predicate for the instruction that the government attempted to prove. Further, the notion that Bonventre's specific knowledge of Madoff's wrongdoing had crystallized to the level required for a conspiracy is in execrable tension with the state of his genuine ignorance of Madoff's criminal intentions and objectives. We see this in the type of cases when conscious avoidance is used in conspiracies. In *Reyes*, 302 F.3d at 154, whatever the state of the defendant's knowledge as to whether the airbags he traded were actually stolen, there was little doubt that the defendant *knew* he was engaging in a conspiracy to transport stolen goods in interstate commerce. Likewise, in *Svoboda*, 347 F.3d at 480-81, whether the trader *knew* that the tip he received was material, inside information, the nature of the conspiracy in which he participated – to commit securities fraud by insider

66

trading – was relatively clear. Similarly, in *Morgan*, 385 F.3d at 201, whether the defendant knew as a matter of factual certainty she was transporting synthetic ecstasy into the United States, there was ample indicia of her knowledge that she was participating in a smuggling scheme and a conspiracy to import a controlled substance.

In all three cases there was a clear link between the illegality suspected and the nature of the specific conspiracy to infer their knowing and intentional participation in it, and to satisfy the specific knowledge required for conspiracy convictions. Not so for Bonventre – whatever facts Bonventre might have consciously avoided confirming (without conceding that he consciously avoided anything) are far too ambiguous and amorphous to distill from them an intent to participate in a conspiracy to accomplish those objectives, or to supply him with the knowledge that the specific conspiracies alleged even existed.

E.    The Charge Was Prejudicial and Not Harmless

Courts review jury instructions *de novo*, and will reverse for prejudicial error. *Aina-Marshall*, 336 F.3d at 170. A charge on conscious avoidance will only be deemed harmless in the face of overwhelming evidence that the defendant possessed actual knowledge of material facts in issue. *See Fofanah*, 765 F.3d at 145 (quoting *Ferrarini*, 219 F.3d at 154); *Kaiser*, 609 F.3d at

67

566-67.  Here, the evidence of Bonventre's actual knowledge was not only *not* overwhelming, it was insufficient to permit that finding, even by the more relaxed preponderance standard the district court used at sentencing.  The district court therefore concluded that Bonventre lacked actual knowledge, and sustained the government's reliance on conscious avoidance.  In context, that finding represents a ceiling of what the evidence showed.  But where that theory is fatally infirm, for the reasons discussed *supra*, this Court must reverse as to all counts, and enter a judgment of acquittal.  No theory of Bonventre's knowing participation in Madoff's crimes can furnish sufficient evidence of knowledge or complicity that simply did not exist.

Point II

THE GOVERNMENT'S REBUTTAL REQUIRES REVERSAL

In denying the defendants' post-verdict motions, the district court described the government's rebuttal remarks as "ill-conceived and unworthy of the institutional stature of the United States Attorney's Office." A12966.  It criticized the prosecutor for instances where he "veered off" into improper territory, and lamented that it "had expected the Government to take a higher and less rhetorical road in its summations," and that "[t]he Government would certainly have done better had it chosen to focus on arguing the specific evidence rather than spend most of its argument repeating derogatory generalizations and wandering into peculiar similes[.]"  A12966, 12958, 12969.

The district court referred to other arguments as ambiguous or unfathomable, and it described errors as "lapses in judgment" or simply that the prosecutor  "misstated the record."  A12966.  With due respect to the district court, merely scolding the government was an inadequate remedy for what occurred.  If any one of the prosecutor's comments can be explained away as harmless or cured, the rebuttal taken as a whole left an indelible mark that severely prejudiced Bonventre and his co-defendants.

69

A.    Rebuttal Misconduct: What Was Said

The rebuttal contained a litany of "don'ts" in a prosecutor's summation – improper vouching, using the prosecutor's personal experience to make him an unsworn expert witness, failure to distinguish individual defendants, ridiculing the absurdity of defense theories and reasonable doubt, appeals to emotion and prejudice, and numerous other highly inflammatory references and false, misleading assertions. A11746-51, 11759-60, 11765-67, 11818-21, 11833-35, 1139-41, 11876, 11898-900, 11908, 11916-17.

Among the more inflammatory references were the prosecutor's comparisons between the defendants and arsonists (A11759), thieves, cheats and criminals (A11820), bank robbers (A11818-19, 11829), traffickers in counterfeit goods (A11822), drug dealers (A11834-35), gunfighters (A11834-35, 11839-40), vandals (A11840-41), Mafiosi (A11820-21), and rogue, fast-food workers where people end up "burning themselves in fry grease" (A11833). That was just the *first* day. The next morning, the prosecutor argued an even more bizarre analogy, comparing the defendants to fast-food workers that butcher cats and serve them to unsuspecting diners. A11916. Such remarks are not merely "colorful" [*compare United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)], but are deliberately prejudicial. To the extent the prosecutor had a point in the astonishing array of

70

cultural and experiential reference points, it appeared to be that they help explain

how criminals behave, and how the defendants' conduct purportedly fit into that

matrix, which the court found improper and directed him to avoid. A11855-56. It

was tremendously, even embarrassingly improper, and enormously prejudicial.

Before Bonventre raised any objection, the court *sua sponte*

interrupted to criticize the prosecutor's use of plural pronouns to embrace all five

defendants or to the firm itself (a tactic he used throughout trial), rather than rebut

specific defense arguments. A11766. Just seconds later, the court interrupted

again, asking if the prosecutor's use of "they" was a reference to BLMIS or to a

particular defendant. A11766-67. At the next break, the court, again *sua sponte*,

tried to impress on the prosecutor the need to hew carefully to the evidence,

especially given the gargantuan scope of the case and the volume of documents

presented to the jury. A11774. It again admonished the prosecutor for:

> an awful lot of absurd, broad brush, unbelievable, they did everything
> that's not tied particularly to evidence" []And be very careful whom you
> accuse of what on what basis. And don't brand each of these people
> with your institutional thesis. You have to prove your case with respect
> to each individual and, obviously, it isn't seriously in dispute that the
> institution was corrupt. The question here is whether these individuals
> knowingly participated in the corruption . . . . So you have an extra
> responsibility both of persuasion but of accuracy and precision.

A11779-81.

71

Earlier in the trial, a defense witness had echoed a defense argument about Madoff's apparent gravitas as a Wall Street icon by referring to an occasion when he had testified before Congress. In an effort to take the sting out of that indisputable fact, the prosecutor asked the witness on cross-examination whether he was aware that the fictional Mafia Don Michael Corleone in *Godfather II* had also testified before Congress, drawing an immediate objection that was sustained. A10247. At a sidebar, Judge Swain noted that three of the five defendants on trial (including Bonventre) were Italian-American, and "[t]his is a case in which serious conspiratorial criminal activity is alleged. These defendants are alleged to have engaged in that with the person to whom you analogized a Mafia don. In this context, that was a step too far." Sealed Transcript at 10139.

Notwithstanding that ruling, the prosecutor regaled the court with his own *Godfather* sequel, revisiting the reference while attempting to explain away Madoff's pervasive lies to everyone, including his own employees, by claiming that participants in criminal conspiracies lie to each other, just like in "The Wire, Sopranos, Godfather movies, Wall Street, that famous one on Wall Street with Charlie Sheen." A11820. After the court sustained a contemporaneous objection, directing the prosecutor not to use movie plots to make his point, he responded by ignoring the ruling and asking the jury, "When you heard in Wall Street that

72

Charlie Sheen, even though they're in an insider trading conspiracy, that he was lied to by his boss, did that seem unrealistic to you?" That comment drew another objection, and the court directed the government to "[p]lease move on." A11821. Then, contrary to that direction that the prosecutor not refer to movie plots to make his point [which the Court issued a second time, A11855], the prosecutor later referred to the defendants as Madoff's "A Team" and then in almost surreal fashion, asked the jurors directly if they were familiar with that program. A11904, 11906.

Bonventre and his co-defendants (the parties had agreed before trial that all defendants joined in the objection of any one defendant, A458) also objected to the rebuttal prosecutor's inflammatory rhetoric comparing the defendants to various types of other criminals, including cocaine dealers, drug couriers and bank robbers, and analogizing Bonventre's understanding of Madoff's omnibus account from which he delegated profitable trades to investors (as corroborated by a government witness) to an armed bank robber wearing a ski mask making "an extreme omnibus withdrawal." A11819, 11829, 11834-35, 11843-44, 11850, 11854-55. In particular, the prosecutor's special standing cloaked him with ostensible expertise about crime that made his comments about how criminals in popular culture behave especially noxious and prejudicial, and

73

allowed him to effect the guise of an unsworn expert witness about the nature of criminality. *See United States v. Wright*, 625 F.3d 583 (9th Cir. 2010) (improper to reference prosecutor's prior experience in other cases and other evidence outside the record).

       As disturbing as the references above are, perhaps more troubling was the government's deliberate distortion and subversion of the record and fair inferences. Where the evidence was not sufficiently inculpatory, the government simply invented a new reality more in line with its view of Bonventre's guilt, and argued it to the jury. Fidelity to the record was as dispensable as the prosecutor's obsequious commitment to abide by the court's admonitions and avoid unfair and unapt analogies. We are not dealing with inferences that are merely "aggressive;" they are unfounded, misleading or contradicted.

       First, the prosecutor misrepresented a conversation overheard by Madoff's secretary, Eleanor Squillari, in which he imputed an understanding that she had expressly disavowed. A11758, 11775-79. The court had earlier permitted the government to elicit from Squillari that she had overheard Madoff say to his brother Peter "to mind his own fucking business, that Dan Bonventre knew how everything worked." Trial Transcript at 2627-31. Bonventre had objected because Squillari could provide no context, having overheard only that snippet,

rendering the testimony not probative of anything, and inviting improper

speculation and undue prejudice. *Id.* The prosecutor then simply invented a false

context for the original remark:

> Remember Miss Squillari, Bernie Madoff's actual secretary? She talked
> about how Bernard Madoff himself screamed at his brother when he
> dared to question Bonventre's absolute authority over his realm. He
> screamed a profanity at his brother, told him to mind his business.
> Those words tell you a lot. They tell you that these weren't just people
> innocently trying to work at what they thought was a legitimate
> investment company. These words are consistent with people who were
> knowingly engaging in and attempting to conceal a fraud.

A11758. Elsewhere, the prosecutor also mentioned repeatedly that the defendants

controlled fake trading, where there was no such testimony about Bonventre or his

co-defendants, false trading having been controlled by Madoff and DiPascali.

A11772, 11776-77.

During the next break, defense counsel expressed a general reluctance

to object during an adversary's address, but disputed the substance of the

argument about Squillari's testimony and asked for an instruction that the

prosecutor's remark misstated the record, and to avoid repeating the testimony

again so as to call attention to it. A11775-76, 11781-82. The court issued a

curative instruction that repeated the original testimony to which Bonventre had

objected in the first place, and explained to the jury that it was to discern the

meaning of the testimony. A11792. The court then sustained other objections to

75

the improper use of defense counsel's arguments in jury addresses (arguing they were false), and to the false insinuation that Bonventre lied on the witness stand in denying having seen a particular document prior to the trial.  A11792-98, 11801-09.

Immediately thereafter, the prosecutor complained that defense counsel were seeking to obstruct his rebuttal with "baseless objections[4]."  A11802.  The court noted that it had sustained multiple objections [A11802-03], but urged defense counsel to simply state "objection" when necessary, which would permit the prosecutor to table whatever demonstrative he was using until she could hear argument during the next break, a procedure that diluted the curative effect of any instruction.  A11805.  The court reiterated that it anticipated fewer objections going forward and expected the prosecutor to heed her rulings.  A11805.  But the prosecutor continued to advance objectionable arguments [A11812, 11815], ultimately causing the jury to sigh audibly in frustration whenever a defense lawyer rose to object.  *Order* at 11; *see also Koufakis v. Carvel*, 425 F.2d 892, 901 (2d Cir. 1970) (noting the inherent risks that a jury might hold the *defense* accountable for obstructionism).

---

[4] In contrast to the rebuttal, Bonventre raised no objections to the other prosecutor's closing argument several days before, which itself stretched over three calendar days.

Complying with Judge Swain's new protocol, the defense attorneys simply said "objection" to avoid further infuriating the jury. At the next break, Bonventre argued that additional comments of the prosecutor and the aggregate impact of the rebuttal had irreparably impaired the fairness of the trial [A11841], and that the damage "can't be undone." A11851. Those additional comments included when the prosecutor displayed a chart to the jury that quoted an argument of counsel in summation out of context, and used it as another foray to compare counsel's remark with Bonventre's testimony [A11811-13] - precisely the type of impropriety about which defense counsel had complained just moments before, and which the prosecutor pressed even after counsel stood to object. A11812-15.

Bonventre also objected [A11838] when the prosecutor pressed an inference that the court found troubling and unfounded earlier in the trial, and that it rejected at sentencing: that defendants Bonventre, O'Hara and Perez had contemporaneously arranged to empty their respective IA accounts (that Madoff had opened for them at the firm) because they feared that an SEC audit would reveal the fraud. A11837-38. While the firm had accomplished the ministerial act of issuing checks on the same day, the defendants made their requests for the withdrawals some time apart, and had no control over when the checks were actually issued. A11845. Bonventre had confirmed that not only did he not have

77

a conversation with either Perez or O'Hara about closing their IA accounts, but that he did not even know that they had such accounts in the first place. A10012. At sentencing, the court expressly rejected the notion that Bonventre had colluded with O'Hara and Perez to close the accounts on the same day, noting instead that he had emptied his account to purchase a vacation home. A13140.

While restating his view that the prosecutor had irreparably rendered the trial unfair and unsalvageable, Bonventre suggested an instruction to the jury, so as not "to make it worse." A11852. But the court did not rule on all the objections, and instructed the jury not to consider the prosecutor's suggestion that any defendant's behavior was typical of other types of criminals, the subject of other objections discussed *supra*. A11857. Upon resuming, as the prosecutor did in virtually every instance when the court sustained a defense objection or gave a curative instruction, he put an obsequious gloss on her instruction to remove its sting and create the misimpression that the instruction validated his view. A11857, 11759, 11766, 11773, 11895, 11912.

After the next section of the rebuttal, again containing multiple misstatements or distortions of fact [A11880, 11891-94], the court again reminded the government of its responsibility to be faithful to the record, "because we do not and cannot realistically expect that the jury will fact check every assertion

against 12,000 pages of transcript and hundreds of thousands of pages of exhibits[.]"  The court ruled that it would instruct the jury on the substance of three of the prosecutor's misrepresentations, telling the jury what the evidence did or did not establish, but without noting that the prosecutor had affirmatively misstated the record.  A11894.  When the prosecutor resumed following the instruction, he again co-opted it by telling the jury that "what the judge emphasized can't be emphasized more.  Your own recollection of what happened during the course of the trial, what was said, controls."  A11895.

After that proverbial lip service, the prosecutor continued to misrepresent the record.  DiPascali testified on the government's case that he had previously testified in a lawsuit brought by a Madoff victim known as Notz Stucki. A7313.  No such testimony had ever been produced in discovery to the defense, which learned thereafter (and proved to the jury on the defense case) that DiPascali had not "testified," but had asserted his Fifth Amendment rights in a case brought by the retired policemen and firemen of Fairfield County (and not by "Notz Stucki"), to which the government ultimately stipulated.  A9411.  In rebuttal, the prosecutor claimed that Bonventre's point was "another example of argument in conflict with reality," because DiPascali had "provid[ed] them with all of the details about the litigation if they want to look at it.  He's not hiding

anything.  He's answered every one of their questions with precision."  A11898.

Despite the government's *stipulation* about the name of the case, not to mention

the implausibility that the government had not known that DiPascali had appeared

for a deposition while cooperating, the prosecutor read DiPascali's initial

testimony to the jury in which he identified Notz Stucki as the name of the lawsuit

as an example of DiPascali's "precision."  A11898, 11906, 11908, 11911.

      The commentary was especially improper because the prosecutor had

vouched for DiPascali's credibility, instructing the jury that as a factual matter, he

"told the truth about what happened with their clients" and was "telling a truthful

account of what happened."  A11898-99; *see United States v. Spinelli*, 551 F.3d

159, 168 (2d Cir. 2008) (finding fault in rebuttal that "invites the jury to rely on an

assurance furnished by the government of the United States of the witness's

honesty"); *United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990) (cautioning

prosecutors to avoid statements that government witness "told the truth").

      Next, the prosecutor claimed that Bonventre had lied in contradicting

the testimony of a trial witness from the Bank of New York that he had

represented to her that he was BLMIS' Chief Operating Officer.  A11902, 11906,

11911.  That witness confirmed, however, that she had *not* learned of that title

from Bonventre, but from her previous boss, and did not know how such

information had been acquired.  A3513-14.  The prosecutor then claimed again

that Bonventre, O'Hara and Perez had emptied their respective IA accounts "at the

exact same time to get out of this thing" and put up a document purportedly

supporting that claim [A11903, 11906], which was not true, and had been the

subject of an objection just the day before.  A11836-37, 11843-45.

        At the next break, Bonventre again stated that the "aggregate effect of

Mr. Jackson's comments today and yesterday has already compromised the

fairness of the trial." A11905.  Notwithstanding the prosecutor's deliberate or

reckless disregard for the court's rulings, it gently reminded him about her prior

ruling about cultural references [A11906]; agreed that the comment about the IA

accounts contradicted the record, but declined to fashion any remedy [A11906];

and instructed the jury only that there was no evidence that the Bank of New York

witness ever received information about Bonventre's title from him.  A11912.

The court noted for the record that the "number of colloquies" necessitated by

"certain aggressive strategies on the part of the government" had "extraordinarily

prolonged" the rebuttal, which had stretched into its second day.  A11912.

Nonetheless, she permitted the prosecutor to correct the record before the jury

about the true name of the case in which DiPascali had testified [A11911-12], thus

81

giving the impression that he, in good faith, was taking the initiative to correct an inadvertent error.

As a final *coup de grace*, the prosecutor rewarded the court's unfailing courtesies with an unfathomable appeal to racial injustice, a call to action that compared the task ahead for the minority jury with Judge Motley's historic efforts with Thurgood Marshall to achieve civil rights for people of color:

> A number of people have told a number of historical stories about things that happened. I want to tell you one short one that I think is important for you to consider as you go back to do your deliberations. It is a story some of you may know, some of you may not, of a woman named Constance Baker Motley. Some of you may have heard of her. She was a litigator who litigated in courtrooms throughout the South for a number of years during the years when a lot of people did not believe a woman even belonged in a courtroom, much less someone litigating on behalf of civil rights. She worked with Thurgood Marshall and other people, arguments in places where there were threats that she would be killed just for making these arguments about the rule of law applying equally to all people. She had the courage, actual courage, real courage to do that because of her belief in the rule of law, the fact that it applies equally to all people, whether they are rich, whether they are poor, no matter what their background, that that was a principle that was worth fighting for. She survived that and she became the chief judge of this court, the first woman, black woman, chief judge of this court.
>
> *     *     *     *
>
> I want to take you back to an even more recent bit of history, the first day that you started on this trial. Do you remember that room that you assembled in? That's the Constance Baker Motley Jury Assembly Room. The reason I submit to you that it is named after her is because we know that all of the jurors who come into this courthouse will

82

approach the case with the same serious, courageous approach to the
case that she approached her life with.

A11917.

The rebuttal was over in the next breath, but the prosecutor's
argument was abominable, and on multiple levels.  The unspoken but
unmistakable subtext was that the jury – composed of six African-Americans and
one Latino – should not permit the well-paid, white defendants to escape the equal
rule of law that Judge Motley fought hard to bring to fruition.  It deliberately
distracted the jury from the difficult issue of the defendants' states of mind with a
charged reference to our shameful history of segregation and racial prejudice.  *See,
e.g.*, *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980) (reversing
conviction after prosecutor used closing argument to improperly appeal to "class
prejudice").  It showed contemptible disrespect for Judge Swain by attempting to
align her mentor with the United States Attorney's pursuit of convictions in an
infamous case.  It put the defense lawyers in the untenable position of risking that
an inartfully-worded objection might offend Judge Swain and insult her supreme
sense of propriety, or worse, aggravate the jurors by failing to capture the
impropriety they had just heard.  But most of all, the prosecutor's argument was
made with the confidence that he could exploit with impunity the "moral panic

dynamic," and that neither Judge Swain nor this Court would dare reverse any convictions obtained in a case that took so long to try, and was based on such an unprecedented fraud that hurt so many people.

B.    Misconduct and Prejudice

Rather than use its rebuttal to plug holes in the government's case or address exculpatory facts that defense counsel referenced in closing arguments, the government instead used it to brand Bonventre as akin to almost every sort of villain imaginable, to exploit the prestige and mantle of the United States Attorney's Office, to press theories of guilt by association, and to grossly distort the evidence, all under the guise of wholesome appeals to the jurors' common sense. None of the prosecutor's references served to actually "rebut" the defense's claims and the evidence it argued. It was instead treated as a second opportunity for a closing argument and went well beyond the scope of what the defense actually argued in closings.

In effect, the prosecutor argued Bonventre's guilt in spite of the evidence, not because of it. *See United States v. Terry*, 702 F.2d 299, 313 (2d Cir. 1983) (criticizing instances where prosecution "divert[s] the jury from consideration of the evidence"); *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011) (reversing where prosecutor's arguments urge conviction "for

84

reasons wholly irrelevant to [] guilt or innocence") (quoting authority). The prejudicial impact of the prosecutor's many improprieties was at least as great as in the cases where this Court has reversed on account of misconduct in a government summation. *See United States v. Certified Envtl. Servs.*, 753 F.3d 72 (2d Cir. 2014); *United States v. Forloma*, 94 F.3d 91, 95-96 (2d Cir. 1996); *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990); *United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990); *United States v. Richter*, 826 F.2d 206 (2d Cir. 1987); *see also Sanchez*, 659 F.3d at 156; *United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007); *United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005); *United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001); *United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999).

The prejudice was aggravated because it occurred in rebuttal, after the defense had the ability to challenge the prosecutor's statements to the jury or to present evidence to the contrary, and as the last thing of substance presented by the lawyers. *See United States v. Gleason*, 616 F.2d 2, 26 (2d Cir. 1979) (noting that risk of prejudice mitigated by court's offer to allow the defense to present a surrebuttal); *Sanchez*, 659 F.3d at 1259-61 (reversing because prejudice aggravated by errors occurred in rebuttal as the last argument heard prior to commencing deliberations) (citing *Carter*). Achieving maximum impact by

85

placing prejudicial remarks at the end of the proceeding is a tactic of ancient

vintage, employed by scoundrels for millenia, as Aristotle [*Rhetoric*, Book III, Part

XIV] explained: "If you want to excite prejudice you must do so at the close, so

that the jurors may more easily remember what you said."

      The prosecutor's misconduct did not begin with rebuttal, but was part

of a prolonged, deliberate strategy. Before trial, Bonventre moved under seal to

preclude evidence 

*see Blissett v. Lefevre*, 924 F.2d 434 (2d

Cir. 1991) (prosecutorial misconduct to attempt to introduce evidence previously

ruled inadmissible).

Judge Swain was also unfailingly courteous in admonishing the prosecutor not to exploit his close proximity to the jury in the Courthouse's ceremonial courtroom (with the defense teams seated on the far side of the courtroom) by making faces and smirking in front of the jury. Each time a defense attorney brought the prosecutor's face-making to the court's attention, and even when she saw it herself, she declined to name the prosecutor as the culprit, reminding "everybody that we all have to be very careful of body language and reactions and communications amongst ourselves that are in sight of the jury." A9349, 2611, 8934-36, 9841-45.

Nor was the highly experienced prosecutor's misconduct limited to this case. In *United States v. Valle*, 301 F.R.D. 53, 104-09 (S.D.N.Y. 2014), Judge Gardephe vacated the most serious count based on sufficiency grounds, but chastised the same prosecutor: "It is worth noting [] that certain arguments made by the Government tended to undermine or contradict the Court's prior rulings and jury instructions, raising concerns about whether – in what was an extraordinary case involving highly inflammatory and emotional subjects – the jury's verdict was the product of unfair prejudice." Judge Gardephe noted that the prejudicial impact of inflammatory and improper comments was highest in a notorious case with equivocal evidence of guilt. *See id.* at 109 n. 61.

87

Moreover, while this Court recognizes that rebuttals are usually "not fully constructed in advance" and tends to grant some latitude on account of their "improvisatory nature," *see Cert. Envtl. Servs.*, 753 F.3d at 97), the prosecutor had days to prepare his rebuttal in response to defense closing arguments that stretched over one week, then had an entire overnight break after the last defense summation was presented, and the rebuttal was structured around an elaborate motif and a detailed PowerPoint visual presentation. Thus, the typical license the government is afforded for a somewhat improvised rebuttal cannot be extended here. None of the remarks were off the cuff.

The prosecutor's experience and ample preparation, in addition to his repeated failures to heed the court's admonitions, demonstrates that the improprieties were deliberate and calculated. *Cf. Forloma*, 94 F.3d at 95-96 (reversing for improper argument even where prosecutor did *not* act intentionally). They were neither inadvertent nor aberrational. *Cf. United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1997) (finding prosecutor's improper remark aberrational and that "[i]n contrast, most of the cases in which we have reversed convictions as a result of prosecutorial misconduct have involved repeated improper statements whose aggregate effect was more likely to undermine the fairness of the trial.") (citing cases); *United States v. Elias*, 285 F.3d 183, 191 (2d Cir. 2002) (prejudice

88

mitigated by only "aberrational" misconduct); *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986).

Worse, and particularly as it has to do with the need to deter future misconduct, the government has not acknowledged that its arguments were in any way improper. Failure to make concessions about glaringly obvious improprieties indicates that only the sanction of reversal, and not mild admonishment, will prevent misconduct in forthcoming cases. *See Melendez*, 57 F.3d at 242-43 (affirming hesitantly after considering government's "awareness that it has departed from prosecutorial standards" where prosecutor forthrightly acknowledged that challenged remarks were error, convincing the Court that "the risk of recurrence is virtually non-existent"); *Rivera*, 971 F.2d at 884. The government's steadfast defense of the improper remarks "suggest[s] a tactical and likely prejudicial advantage that the Government wants to achieve". *See Melendez*, 57 F.3d at 242-43.

Even putting aside the "story" about Judge Motley, the prosecutor's repeated false assertions and misrepresentations are among the most grievous sins he can commit. *See United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence"); *Richter*, 826

89

F.2d at 209 (reversing for prosecutor's misleading summation and "special duty not to mislead" or "deliberately misstate the evidence"); *United States v. Valentine*, 820 F.2d 565, 566 (2d Cir. 1987) (reversing where prosecutor misrepresented grand jury testimony); *United States v. Modica*, 663 F.3d 1173, 1178-81 (2d Cir. 1981) (warning the prosecutor of his special duty as a public representative not to mislead); *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth"); *see also United States v. Reyes*, 577 F.3d 1069, 1076-79 (9th Cir. 2009) (reversing in "complex" stock-option backdating case that centered on defendant's knowledge and intent, despite government's "strong" case, because prosecutor presented jury with arguments known to be false or with strong reason to doubt); *United States v. Blueford*, 312 F.3d 962, 975-76 (9th Cir. 2002) (reversing where prosecutor argued to jury to infer fabrication of alibi evidence from defendant's telephone activity with alibi witnesses, despite listening to tapes of those conversations in which he instructed witnesses to tell the truth). The prosecutor's misrepresentations went well beyond mere "spin" or reasonable inferences. *See United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990).

Courts must be attentive to the status and duty of the prosecutor as a public representative. *See United States v. Young*, 470 U.S. 1, 17-19 (1986); *United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013) (internal citation omitted). The improprieties were not incidental, aberrational or accidental but were intentional, pervasive and sustained. Coming not from a private litigant but from a highly experienced government prosecutor, such "pronounced and persistent" misconduct is all the more inexcusable. *See Berger v. United States*, 295 U.S. 78, 88-89 (1935).

To be sure, the court delivered a number of curative instructions, as well as other admonitions to the prosecutor. A11760, 11766, 11772, 11791-92, 11832, 11857, 11895, 11912. The sheer number of instructions was extraordinary in a government rebuttal. And the court instructed the jury on several occasions that specific inferences that the prosecutor argued lacked support in the record. A11791-12, 11895, 11912. The instructions, however, were mild and not the sort of particularly emphatic remedies that have served to cure blatant errors or improprieties. *See Melendez*, 57 F.3d at 241-42; *Friedman*, 909 F.2d at 710; *United States v. Tutino*, 883 F.2d 1125, 1136 (2d Cir. 1989). Moreover, many of the instructions were delivered well after the improper comment, which allowed the misconduct to crystallize and take root in the minds of the jurors, and diluted

91

whatever impact the instruction would otherwise have had.  *See Lesko v. Lehman*, 925 F.2d 1527, 1546-47 (3d Cir. 1991) (errors in prosecutor's summation not harmless where curative instruction did not immediately follow improper argument).  And, of course, the instructions addressed minutia of the factual record which were dwarfed by the prosecutor's kamikaze bombast, which the district court never addressed in front of the jury.

By far, the district court reserved its more stern and piquant reprimands to occasions when the jury was *not* present.  A11774, 11778-81, 11805, 11855, 11888, 11910, 11912.  The court's dismay at being continuously ignored was, at times, palpable.  The cold transcript at A11910, for example, does not capture the court's frustration with the prosecutor nor the force with which it delivered the warning about blatantly misleading the jury, both exceptional for a judge noted for her patience, courtesy and calm temperament.  Because the jury heard only the more sanitized instructions, it could not have appreciated how improper the prosecutor's arguments were.  In any event, as discussed *supra*, the prosecutor's custom of co-opting the instructions diminished their intended effect.  And in the final analysis, the prejudice was too profound to be cured by clarifying instruction.  No curative instruction could have undone the damage that the government caused in its rebuttal.  *See Floyd*, 907 F.2d at 356.

92

The United States Attorney is correct when he says in his various press releases that court action is often the only way to send a message that will deter unacceptable conduct. Reversal is the only way to send a message that the type of prosecutorial misconduct used to secure convictions in this case is unacceptable. *See Cert. Envtl. Servs.*, 753 F.3d at 96 (reversing because of improprieties in the government's jury addresses, and warning that the Court "will not lightly overlook such repeated violations of clearly announced rules"). If the government is not called to account for behavior that defines the word "egregious" or if this Court chastises the government only by reminding it yet again that, for example, it "would have been better advised" [e.g., *Spinelli*, 551 F.3d at 168] to avoid its chosen course, then it is almost certain to recur.

In *United States v. Antonelli Fireworks*, 155 F.2d 631, 637 (2d Cir. 1946), a case arising from a conspiracy to defraud the United States by manufacturing defective war munitions, the prosecutor ended his summation (during the Allied invasion of Normandy in June 1944) with a call to action similarly prejudicial to the prosecutor's story about Judge Motley:

> I cherish an overwhelming confidence, ladies and gentlemen, in the belief that each one of you, after you have been instructed by the Court, will each render your verdict without malice, but without sympathy, that you will each render a verdict of which you can always be proudly justified in the presence of your fellowmen, those here at home who labor and have labored

93

unceasingly in an honest effort to manufacture munitions of war as well as those of us beyond the seas who look to us for the things they need to sustain them in their hour of extreme sacrifice.

If we substitute matters of race and class for war-time patriotism, the substance of both arguments is effectively the same. This Court affirmed, finding the offending remarks "ill advised and overzealous" but not sufficiently prejudicial to warrant a new trial. *See id.* at 638. But the case is more notable for Judge Frank's dissent, taking the government to task and questioning the Court's willingness to condone egregious conduct in the name of harmless error:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect," "Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of 'disapproved' remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial." "Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court -- recalling the bitter tear shed by the Walrus as he ate the oysters -- breeds a deplorably cynical attitude towards the judiciary.

*Antonelli Fireworks*, 155 F.2d at 661 (Frank, J., dissenting).

Fortunately, however, this Court is not confronted with overwhelming evidence of Bonventre's guilt, which might otherwise cause the claim to fall into the harmless error vortex. Judge Swain's rejection of government theories of guilt, coupled with her express finding that DiPascali was a "glib storyteller" and not a credible witness, and the government's plain bullying of Cotellessa-Pitz and others, show that the government's evidence of Bonventre's state of mind was hardly as "overwhelming" as the prosecutor argued in rebuttal. A11870. *Cf. Cert. Envtl. Servs.*, 753 F.3d at 97 (reversing for prosecutorial misconduct despite a "quite strong" but "not overwhelming" case that lacked a "smoking gun" and instead relied heavily on cooperating witnesses).

It was an equivocal case against five thinly-educated employees of one of the most successful psychopaths who has ever lived. The prosecutor resorted to misrepresentations and unrelenting shtick rather than explain how the most exculpatory facts in Bonventre's favor were consistent with the government's theory of guilt: Bonventre sent to storage a box containing false records with which he purportedly helped Madoff defeat a tax audit and wrote his name and the words "tax audit" on the box before doing so [A9725]; he remained at BLMIS for three months after its collapse, speaking to investigators without the assistance of counsel [A9673]; and he oversaw the mechanics of the hundreds of

95

thousands of real trades made daily in the firm's separate broker-dealer business, making it all the more difficult to imagine that his iconic employer was a Wizard of Oz. The characterized version of Bonventre that the prosecutor falsely represented to the jury was of a knowing, high powered insider manipulating and deceiving others. What the actual evidence established, however, was far more consistent with a trusting functionary manipulated and deceived by others. The difference between those two versions of Bonventre is the difference between his guilt and his innocence.

By the time the jury retired to deliberate, the government's case against Bonventre was composed of three essential pillars: (1) the notoriety of Madoff's spectacular fraud coupled with Bonventre's forty-year association with him; (2) weak, unsupported inferences of his guilt, especially as to knowledge and intent; and (3) the inflammatory rhetoric and grossly misleading assertions in the government's rebuttal. No amount of objections, curative instructions, or chastising of the government was sufficient to neutralize the prejudice that the government's rebuttal summation engendered. At that point, it was simply

96

impossible.  Where the misconduct was severe, the curative measures inadequate, and the evidence highly equivocal, this Court should reverse[5].

---

[5] Whether the government's case was sufficiently strong such that the misconduct was harmless is a separate question from the sufficiency of the evidence.  Evidence in a given case might well be sufficient for purposes of appellate review – if only because this Court views it in the light most favorable to the government and draws all reasonable inferences in its favor – but at the same time well short of being strong, overwhelming or unequivocal.  However this Court resolves Bonventre's challenge to the use of a conscious avoidance theory of guilt and the evidence of a factual predicate for the instruction says little about whether the government's equivocal case was strong for purposes of harmless error in the government's rebuttal.

POINT III

CHARGES BASED ON BONVENTRE'S EVASION OF
PERSONAL INCOME TAX SHOULD HAVE BEEN SEVERED

Bonventre moved before trial to sever the counts charging him with individual income tax violations (Counts 20-23) as improperly joined with the counts charging some other species of fraud (securities, mail, bank) or the maintenance of false books and records at BLMIS. He contended both that joinder of the two sets of offenses was improper under Rules 8(a) and 14 of the Federal Rules of Criminal Procedure, which requires severance of offenses when a joint trial causes undue prejudice. The district court denied the motion, deferring to the government's allegations in the Indictment, as well as in its opposition papers that the funds at issue in the tax counts were compensation for Bonventre's complicity in the larger fraud, that the tax crimes helped "facilitate" the Ponzi scheme, that they were all part of a larger common scheme, and that an appropriate limiting instruction could adequately cure any prejudice. A391-92. Whether or not the court was required to give credence to the government's allegations or should have probed deeper behind its conclusory representations, the trial proved the fallacy of those positions. The two sets of crimes had nothing to do with each other and were not part of any larger or common scheme.

Rule 8(a) authorizes joinder of offenses when they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." But because Bonventre was tried with co-defendants, the Court applies the more restrictive standard in Rule 8(b) that the offenses be part of the same act or transaction or series of acts of transactions, without reference to a common scheme or plan. *See United States v. Turoff*, 853 F.2d 1037, 1043-44 (2d Cir. 1988); *see also United States v. Shellef*, 507 F.3d 82, 97 n.12 (2d Cir. 2007); *United States v. Biaggi*, 909 F.2d 662, 675-76 (2d Cir. 1990).

"[C]ounts might be 'connected' [for joinder purposes] if one of the offenses 'depends upon or necessarily leads to the commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'" *Shellef*, 507 F.3d at 98. "Tax counts may be joined with non-tax counts where it is shown that the tax offenses arose directly from the other offenses charged. The most direct link possible between non-tax crimes and tax fraud is that funds derived from non-tax violations either are or produce the unreported income. Thus, if a defendant is charged with fraud, the government may prosecute the defendant for fraud and for not paying taxes on the profits produced by the alleged fraud jointly." *United States v. Litwok*, 678 F.3d 208, 216 (2d Cir. 2012) (citing *Shellef*, 507 F.3d at 98).

99

But neither the evidence accessible to the district court before trial, nor the proof at trial itself, established that the two categories of crimes were somehow interdependent or intertwined. *See Shellef*, 507 F.3d at 98; *Turoff*, 853 F.2d at 1043. In such circumstances, courts have repeatedly severed tax counts improperly joined with distinct fraud charges, or were reversed for not doing so. *See, e.g.*, *Litwok*, 678 F.3d at 217-18 (reversing for lack of any link between income in tax evasion count fraudulent insurance claim underlying mail fraud); *Shellef*, 507 F.3d at 99-100 (vacating conviction because tax counts improperly joined with conspiracy, wire fraud, money laundering charges, as funds generated by the fraud were unrelated to unreported income in tax counts); *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978) (reversing after income tax counts improperly joined with Medicaid fraud counts because unreported income – the subject of tax counts – could have derived from legitimate activities of the business that generated income from Medicaid fraud); *United States v. Kerik*, 615 F. Supp. 2d 256, 275 (S.D.N.Y. 2009) (severing nearly all tax counts from honest services fraud after government "cobbled together [] a laundry list of illegal schemes and false statements made over a span of eight years"); *United States v. Schlegel*, 2009 U.S. Dist. LEXIS 20912, at *7 (E.D.N.Y. Mar. 16, 2009) (severing tax counts from securities fraud for lack of basis to believe that unreported funds

100

were obtained from the charges in non-tax counts or that tax counts furthered the objects of the securities fraud conspiracy); *United States v. Stein*, 2008 U.S. Dist. LEXIS 58024, at *7-9 (S.D.N.Y. July 31, 2008) (severing personal tax evasion counts from conspiracy to defraud the United States through use of fraudulent tax shelters and substantive evasion through losses associated with tax shelters).

        The common thread of these cases, as here, is the absence of proof that the conduct and funds forming the basis of the tax counts were sufficiently and necessarily linked to the separately charged fraud.  If the trial proved one thing conclusively, it was that the conduct charged in the tax counts had nothing to do with the larger fraud in the IA business at BLMIS, nor with the subsidiary violations and other fraudulent conduct charged in the indictment.  The government proved neither that Bonventre received extra compensation to reward his participation in the fraud, nor that the income (in the form of trades or other benefits) underlying the income tax counts was derived from the fraud and IA transfers to BLMIS.  *See Shellef*, 507 F.3d at 99-100 ("[T]he fact that the businesses that produced the 1996 unreported income were also subsequently used to perpetrate the alleged conspiracy and wire fraud does not justify a conclusion that the offenses charged are 'based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan'").

101

That Bonventre worked at BLMIS, where a fraud indisputably occurred, and that he derived income from his employment there does not justify joinder on the theory that such income is directly linked to or "arose directly" from the fraud. *Turoff,* 853 F.2d at 1043-44. Bonventre's employment in the legitimate broker-dealer business required the government to show some stronger link between his employment income and the fraud. Whether or not he improperly attempted to minimize his tax liability has nothing to do with Madoff's efforts to defraud investors, regulators, auditors and banks. Proof of the tax counts was unnecessary to complete the story of how the fraud occurred, and was neither "indispensable" nor "helpful" to understanding the larger fraud, nor did it show how such conduct facilitated the Ponzi scheme, because it was entirely unrelated. *See Biaggi*, 909 F.2d at 676; *Turoff*, 853 F.2d at 1044.

Even if joinder was proper under Rule 8, the inclusion of the tax counts was sufficiently prejudicial to require a severance under Rule 14. Bonventre was unfairly tarnished by the jury's consideration of the evidence on the tax counts. It allowed the government to introduce over fifteen years of his tax filings – over Bonventre's objection that the jury only should have considered his income in the four years that were the focus of his income tax counts – and thus portray him as a greedy, pampered, tax cheat "with a propensity to engage in

102

fraudulent activity." *See Litwok*, 678 F.3d at 217-18. That evidence would not have been admissible in a separate securities fraud trial, or at least to a far lesser extent, because it did not relate to the securities fraud offenses nor was it remotely probative of Bonventre's knowledge, motive, or intent in purportedly helping Madoff execute his fraud. *See id.* It "inevitably colored the jury's view of [Bonventre's] role in the mail fraud scheme," and requires reversal, particularly where the evidence on the fraud charges, as in *Litwok*, was "certainly not overwhelming." *Id.* It allowed the jury to pass over the far more equivocal evidence of Bonventre's intent as to the securities offenses, an intent divorced from any intent to evade personal income taxes.

In short, Bonventre's knowing involvement in the securities counts was rendered far more plausible because of unrelated conduct charged in the tax counts that had nothing to do with defrauding IA clients, regulators, banks and auditors. A case where the risk of prejudice from a long-time association with Bernard Madoff was already extraordinarily high required special measures to ensure that the jury's verdict was not further tainted by improprieties that had nothing to do with the charged securities offenses. Where the government introduced evidence of fifteen years of false tax filings, superimposed over allegations of deliberate participation in a fraud of epic proportions for decades,

103

the court's proposed remedy of a limiting instruction was far too weak. Only

severance could have offered some semblance of meaningful protection against

undue prejudice.

POINT IV

BONVENTRE WAS DENIED DUE PROCESS BY THE GOVERNMENT'S
FAILURE TO PROVIDE ADEQUATE PARTICULARS

Despite charges that spanned nearly forty years and millions of

documents, the district court failed to order that the government adequately

particularize its allegations against Bonventre, notably in two forms.  Bonventre

moved for particularization as to the specific records proving the charges against

him, especially pertaining to the counts (9-14) alleging maintenance of false books

and records required for broker-dealers and investment advisors.   He also moved

for the government to specify whether it was charging him as a knowing

participant in Madoff's Ponzi scheme, perhaps some of the most basic information

available to a criminal defendant.  The court declined to order disclosure or

particularization, and instead ordered the government to disclose its 60 days

before trial.  A397.

The government vacillated for a period of years as to whether the

indictment (superseded several times in the interim) actually charged Bonventre

with having knowledge of, and participating in Madoff's Ponzi scheme, as

opposed to other subsidiary or derivative species of fraud at BLMIS that supported

or enabled the larger Ponzi scheme.  For example, the indictments charged

105

multiple counts and multiple spheres of conduct, but the government referred to "the fraud" as either encompassing the Ponzi scheme or not, without any downside. Thus, until trial and arguably even now, Bonventre lacked basic information about the nature and scope of the government's accusations.

In this way, the government could tarnish Bonventre with all the prejudice inherent in a longtime association with Madoff, and could introduce devastating evidence of the biggest Ponzi scheme in history, even as it declined to clarify whether and how Bonventre knowingly participated in that scheme. Of course, the Ponzi scheme, precisely because it was so inherently prejudicial, assumed a central role in the government's presentation. Indeed, one of the government's very first witnesses, an expert fraud examiner testified – again over the defendants' objections – for days about the Ponzi scheme and its gory details even before the government proved it or demonstrated its relevance to the defendants' states of mind. A1463, 1566, 1625, 1756; *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005) ("[I]t is [improper] for a party to open its case with an overview witness who summarizes evidence that has not been presented to the jury [and is] particularly problematic in criminal cases because it allows the government to paint a picture of guilt before the evidence has been introduced") (citing authorities); *see also United States v. Miller*, 738 F.3d 361, 370-71 (D.C.

106

Cir. 2013) (describing inherent dangers in overview testimony before underlying proof admitted); *United States v. Moore*, 651 F.3d 30, 54-61 (D.C. Cir. 2011); *United States v. Flores-De Jesus*, 569 F.3d 8 (1st Cir. 2009). Then, when the evidence did *not* show that Bonventre was aware that the IA business was a Ponzi scheme, the government could argue that it did not matter, because those facts were not elements the government needed to prove to obtain verdicts on the charged crimes.

Second, some particularization of documents was essential, as well as what information in them was false, and how and why Bonventre knew of such misrepresentations. Despite making plain that he was not seeking a sneak preview of evidentiary detail but was looking for only the bare minimum – the documents alleged to be false and why for counts charging false filings – the district court endorsed a permissive view in tension with this Court's line of cases requiring particularization, beginning with *United States v. Bortnovsky* 820 F.2d 572, 574 (2d Cir. 1987) and *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988). At least *some* advance knowledge of the categories of documents alleged to be false would have allowed Bonventre to target his defense by showing how his lack of knowledge of the falsity of a particular record or entry was reasonable.

107

Particulars would also have required the government to narrow its proof to the specific allegations charged in the indictment. Bonventre was charged, for example, with securities fraud for defrauding IA clients and with related books and records violations (Count Six, Nine and Twelve), premised on false client account statements and false trade confirmations, even though he had nothing to do with creating or sending such documents, nor with selecting the underlying false trading. The jury, however, was not instructed on a *Pinkerton* theory of liability for substantive crimes, which precludes its reliance on *Pinkerton* to find Bonventre's guilt on those counts. *See United States v. Giraldo*, 80 F.3d 667, 676-77 (2d Cir. 1996); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990). Because the government was never required to identify the specific documents relevant to a given count, the jury could not have given individualized consideration to every count by actually applying the evidence offered.

A bill of particulars is appropriate for multi-faceted or multiple conspiracies, *see United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1995) (citing cases), particularly where the district court denied Bonventre's request for a jury instruction on multiple versus unified conspiracies. A178 (Document No. 665), 9480-82. It is especially warranted in a prosecution for a massive fraud that occurred over many years. *See, e.g.*, *United States v. Nachamie*, 91 F. Supp. 2d

108

565, 570-76 (S.D.N.Y. 2000) (directing bill of particulars in Medicare fraud

conspiracy after government failed to specify which medicare claims were false,

identifying unindicted co-conspirators and details and identity of each allegedly

false claim); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000)

("It is no solution to rely solely on the quantity of information disclosed by the

government; sometimes, the large volume of material disclosed is precisely what

necessitates a bill of particulars."); *see also United States v. Torres*, 901 F.2d 205,

234 (2d Cir. 1990) (requiring bill of particulars where the "charges of the

indictment are so general that they do not advise a defendant of the specific acts of

which he stands accused") (citing authorities).  Even to describe the government's

disclosure as a "document dump" is charitable; it was more like a staggering

landslide.  From Bonventre's computer alone, the government recovered *43

gigabytes* of information.

      The district court had some sense of the difficulty in preparing a

defense for trial and preventing unfair surprise.  It described the "generic

categories of documents listed in the Indictment, the fact that the charges in the

Indictment spans decades, the sheer volume of documents at issue in this case, the

number of Defendants allegedly involved and the difficulty for the Defendants in

determining which Defendant is alleged to have produced, or been involved in

producing, each document". A397. But its remedy for the gargantuan scope of the case was merely to require advance government disclosure of its exhibits and to indicate on an exhibit list the defendant(s) against whom a particular exhibit pertained. That solution was inadequate, and did little to particularize the charges as a matter of due process or bring them into sharper focus. The exhibit list itself – which the government continually augmented through its presentation of evidence – exceeded one hundred pages, while the exhibits themselves were several thousand in number, totaling millions of pages, and representing over 35 gigabytes of information.

At trial, moreover, the government *never* clarified the particular documents that were the subject of each count. It did not argue to the jury what particular records were the basis for each count. Instead, as discussed above, it spent its rebuttal telling the jury about "cat burgers," *The A-Team*, drug dealers and *The Godfather*, and otherwise distorting the evidence to press inferences that could not be drawn from the record. Thus, the failure to particularize not only deprived Bonventre of the ability to defend himself at trial, but more than raises the specter that the jury was similarly overwhelmed and based its verdict on the razzle-dazzle it heard, the sheer volume of documents, and the notoriety of the fraud rather than on the actual evidence of Bonventre's guilt. The government

110

inundated the jury just as it inundated the defendants, and without an order

particularizing the allegations and documents on which it relied, there was no way

Bonventre could meaningfully defend himself.

<u>Conclusion</u>

For the foregoing reasons, this Court should reverse and vacate the

judgment of the district court, and remand the proceedings to the district court

with directions to dismiss the indictment, or in the alternative, to conduct a new

trial.

Respectfully submitted,

 /s/
Andrew J. Frisch
Jeremy B. Sporn
Amanda L. Bassen
40 Fulton Street, 23rd Floor
New York, New York 10038
212-285-8000

*Counsel for Appellant*
*Daniel Bonventre*

July 21, 2015

111

## CERTIFICATION OF COMPLIANCE

Pursuant to an order of this Court dated July 14, 2015, which granted permission for Appellant Daniel Bonventre to file a brief not to exceed 25,000 words, the undersigned hereby certifies that the foregoing brief is in compliance therewith and contains 24,981 words, as measured by the word processing program used to prepare the brief.

 /s/
Jeremy B. Sporn
The Law Offices of Andrew J. Frisch
40 Fulton Street, 23rd Floor
New York, New York 10038
212-285-8000

July 21, 2015